671 So.2d 502 (1995)
Aimie Jo RUPERT
v.
Mark D. SWINFORD.
No. 95 CA 0395.
Court of Appeal of Louisiana, First Circuit.
October 6, 1995.
*504 Ernest S. Anderson, Slidell, for Plaintiffs-Appellees.
Richard A. Swartz, Slidell, for Defendant-Appellant.
Before LeBLANC, WHIPPLE and FOGG, JJ.
FOGG, Judge.
In this custody case, the child's father appeals a judgment awarding custody jointly to him and the child's maternal grandmother. For the following reasons, we affirm.
On February 3, 1993, Aimee Jo Rupert[1] filed suit against Mark D. Swinford seeking to prove his paternity of her child, Derrick C. Rupert, to obtain child support, and to obtain sole custody of Derrick. The parties were not married when Derrick was born on June 30, 1987, nor did they marry thereafter. In a judgment signed on March 25, 1993, the mother and father stipulated that joint custody should be awarded with the mother as the domiciliary parent and that the parents would alternate physical custody of Derrick each month, with the father's month beginning in April. On May 13, 1993, the court signed a judgment decreeing that Mark Swinford acknowledged paternity of Derrick and that the father and mother were granted joint custody, with the physical custody alternating monthly.
On May 25, 1994, the father filed a rule to modify custody, seeking sole custody. The mother and the child's maternal grandmother, Gale L. Rupert, responded with a motion for contempt and change of custody. In their motion, the mother and grandmother prayed for custody to be awarded jointly to the mother and grandmother. Following a hearing on August 10 and 12, 1994, the trial court rendered judgment awarding joint custody to the grandmother and the father, naming the grandmother the domiciliary custodian and granting the father visitation on alternate weekends; the judgment gave the mother visitation every other Sunday between 1:00 p.m. and 6:00 p.m. on the weekends when the father did not have Derrick. From this judgment, the father appeals.
On appeal, the father contends that the trial court erred in its interpretation of LSA-C.C. art. 133, which authorizes an award of custody to a non-parent; in its award of joint custody to the father and grandmother without a specific finding that sole custody to him would result in substantial harm to Derrick; and in failing to award sole custody to the father based on the evidence.
LSA-C.C. art. 133 states, "If an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment." Therefore, to award custody to the grandmother and father jointly, the trial court must determine that joint custody to the mother and father would result in substantial harm to Derrick, that sole custody to the mother would result in substantial harm to Derrick, and that sole custody to the father would result in substantial harm to Derrick.
*505 Initially, on appeal, the father contends that because the court awarded joint custody to him and the grandmother, the court could not have determined that an award of sole custody to him would result in substantial harm to the child. This contention has no merit. Under LSA-C.C. art. 133, a finding that an award of sole custody to a parent would result in substantial harm to the child does not preclude that parent from being considered in a joint custody award with a non-parent. A court could determine that joint custody between the parent and non-parent would not result in substantial harm to the child and name as the domiciliary custodian another person with whom the child has been living in a wholesome and stable environment or any other person able to provide an adequate and stable environment, giving the parent visitation. Schloegel v. Schloegel, 584 So.2d 344 (La.App. 4th Cir. 1991); see also Revision Comments1993 to LSA-C.C. art. 133, section (c).
The father next contends that the trial court erred by failing to state in its reasons for judgment that sole custody to the father would result in substantial harm to Derrick. Unlike prior civil code articles governing custody awards to non-parents, LSA-C.C. art. 133 does not require an express finding that sole custody to a parent would cause substantial harm to the child.[2] Furthermore, the judgment itself is controlling, not the reasons for judgment. Spalitta v. Silvey, 526 So.2d 471 (La.App. 1st Cir.), writ denied, 532 So.2d 115 (La.1988). Therefore, if the record supports the determination that an award of sole custody to the father would cause substantial harm to Derrick, the trial court's failure to articulate such a finding would not be legal error. See Edwards v. K & B., Inc., 26,002 (La.App. 2d Cir. 8/17/94), 641 So.2d 1040; Schloegel, 584 So.2d at 347. Thus, we will next consider whether the record supports the finding that an award of sole custody to the father would cause substantial harm to Derrick.
In a case such as this, where the father and mother stipulated to an award of joint custody, a party seeking to modify the existing custody arrangement must prove that a change in circumstances materially affecting the child's welfare has occurred since the original decree and that the modification proposed is in the best interest of the child. Connelly v. Connelly, 94-0527 (La. App. 1st Cir. 10/7/94), 644 So.2d 789. Additionally, a nonparent always bears a heavy burden of proof in a custody contest with a parent. Love v. Love, 536 So.2d 1278 (La. App. 3d Cir.1988). A parent cannot be deprived of custody except for compelling reasons supported by clear and convincing evidence. Creed v. Creed, 94-268 (La.App. 3d Cir. 12/21/94), 647 So.2d 1362; Pittman v. Jones, 559 So.2d 990 (La.App. 4th Cir.), writ denied, 565 So.2d 451 (La.1990).
Derrick was born on June 30, 1987, and was seven at the time of the custody hearing. The testimony established that Derrick lived in the grandmother's home with his parents immediately after his birth and then off and on during the next seven years. For periods of time, Derrick, his mother and his father lived together in various residences, including the grandmother's residence. During the 1992-1993 school year, Derrick lived with his grandmother; during the following school year, he lived with his father.
Derrick testified, stating that he was living with his father at the time of the hearing and everything was "fine." According to Derrick, his father worked during the day and an aunt kept him after school until his father returned home. Derrick testified that he saw his grandmother every other weekend. According to Derrick, his father did not smoke around him "a lot," and when asked by the judge if his father smoked marijuana, *506 Derrick testified that he did not know what the judge was talking about and that he never saw his father roll cigarettes.
The grandmother testified that she worked as an accountant and lived alone in a three bedroom home she owns in Slidell. She testified that Derrick told her he had three homeshis mother's, his father's and hers. Derrick keeps his dog at the grandmother's house and has his own room there. The grandmother testified that since Derrick's birth, he has been in her home almost every weekend, and that she has "had" him more than anyone else. The grandmother takes Derrick on vacations and on camping trips, and stated that her relationship with him is "extremely close." The grandmother testified that she bought most of his clothes and paid his medical and day care expenses when necessary. According to the grandmother, the father was only involved in Derrick's life to a great extent for the past year. The grandmother also testified that she began having difficulty seeing Derrick in April, 1994, while he was in his father's custody. The grandmother testified that if she were awarded custody she could arrange her schedule to bring Derrick to school in the morning and to be home at a reasonable time in the afternoon.
The grandmother testified that the father had been involved with using and dealing drugs. According to the grandmother, in June, 1992, at Derrick's fifth birthday party, the father and his brothers and neighbors were smoking marijuana. She also testified that when she picked Derrick up from his father's on July 8, 1994, she thought that the father was "definitely high" because apparently in the past she had observed that his face "kind of lights up when he smokes pot" and she noticed such an appearance on this occasion. She added that his face was red, his eyes were glazed, and she smelled marijuana in his home. Derrick also told her when he was living with his mother and father in their trailer, he knew where his father's "stash" was kept. Additionally, she testified that while in his father's care, Derrick would sleep sometimes at one apartment house, sometimes somewhere else and sometimes at the father's girlfriend's house, and that Derrick had no regular meal times and kept late hours. She also stated that the father neglected to take him to the doctor or dentist. Additionally, she testified that the father worked late and was gone on the weekends.
On cross-examination, the grandmother testified she was seeing a psychologist about every two or three weeks due to the problems with Derrick's custody and that she was a recovering alcoholic with seventeen years of sobriety. She also testified that on one occasion, she asked the father to remove Derrick from her home because she was involved in an altercation with the mother.
The mother testified that the father had always been a part of Derrick's life and had been a good father, helping her and paying child support and for whatever Derrick needed. However, the mother stated that Derrick's diet since he had been living with his father was poor and that he was having dental problems from eating too many sweets. The mother testified that Derrick never wore a helmet when he rode his gocart. Regarding fights she had with the grandmother, the mother stated that some escalated into physical confrontations, with the police intervening on one occasion.
She testified that she believed Derrick was being exposed to illegal drug use while he was in the father's custody. One evening in May, 1994, she went to see Derrick at his father's girlfriend's house and the whole house smelled of marijuana. She also testified that in May, 1994, Derrick indicated that his father smoked marijuana in his presence. She stated that she had seen Derrick pick up a dollar bill and lick it all the way across, in the manner a marijuana cigarette is rolled. She testified that the father did not use drugs while they were together for three weeks sometime after February, 1991, and that the last time she saw the father use marijuana was in April, 1994.
Galynn Mejia, Derrick's maternal aunt, testified that Derrick and his grandmother are very close and that Derrick was with his grandmother much of the time. She testified that the grandmother basically raised Derrick when he was very young. According to Mejia, her mother could offer Derrick the *507 best home and she could offer him stability, security and structure and could meet all of his needs.
Mejia testified that at Derrick's birthday party two years ago the father and his family were drinking and "some people" were smoking marijuana. She testified that nothing she had seen in the last year led her to believe that the father was using drugs, but that within the last two years, on one occasion, he had come to her mother's house and appeared as if he had been smoking marijuana.
The father testified he lives in a four bedroom home with a roommate, Tommy Scott, and that Derrick has his own room. The father works for a roofing company during the day and is home at night. He took Derrick to school every morning and after school Derrick stayed with his sister-in-law. The father testified that Derrick was awarded "Citizen of the Month" by the school in March, 1993, and weekly he went to Derrick's school and ate lunch with him. Additionally, Derrick's report card reflected that he did well in school while living with his father. The father testified that he bought most of Derrick's clothes and that he had provided medical care for Derrick, including dental care. According to the father, Derrick is closest to him and is very happy with him. Derrick and his father go fishing, boat riding, bike riding and go-cart riding together.
The father testified that his girlfriend spent the night once a month at his home, and that he and Derrick spent the night at his girlfriend's house about once or twice a month. Derrick had his own room at the girlfriend's house. He testified that he had never had intimate relations with his girlfriend in his son's presence.
The father testified that he did not currently use illegal drugs and only drank one six-pack of beer a month. He stated that he had last used illegal drugs in January, 1992. The father testified that Derrick was never around marijuana when he was with his father.
Thomas Scott, the father's roommate, testified that he began living with the father in January, 1994, and that he had known him for seven years. He testified that the father provided meals for Derrick, washed clothes for him and provided Derrick with financial means. Scott testified that the father typically left home about 7:00 a.m. or 8:00 a.m. and returned between 6:00 p.m. and 8:00 p.m. According to Scott, the father's girlfriend spent the night at their house about three or four days per month. He could not state how many times Derrick and his father spent the night at the girlfriend's house, and he stated that Derrick also spent the night at his aunt's house sometimes. Later he testified that Derrick only spent the night at his aunt's or the girlfriend's house two or three times per month.
Scott stated that he had not seen the father use marijuana while they were living together; he testified that he did not use marijuana and that no one who had ever been to his house would use marijuana. Scott testified that he had never seen the father smoke marijuana, nor was he aware that the father used drugs before 1992.
Barbara Swinford, the father's sister-in-law, testified that she cared for Derrick after school during the school year and occasionally during the summer while the father was working. Swinford testified that Derrick loves his father "more than anything" and that Derrick had told her that he did not like to be away from his father. Johnnie Swinford, another sister-in-law, testified that Derrick occasionally spent the night with her and his seven year old cousin. She testified that Derrick's relationship with his father is very loving and that the father takes good care of Derrick.
The father's girlfriend testified that she had known the father for six years. She stated that the father and Derrick had spent the night at her house a couple of nights per month, and she occasionally spent the night at the father's residence. She testified that they never had intimate relations in front of Derrick. She stated that she does not use marijuana and that she had never seen the father smoke marijuana.
After a thorough review of the record, we cannot say the trial court abused *508 his discretion in determining that awarding sole custody of Derrick to his father would result in substantial harm. A trial court's award of custody is entitled to great weight and will not be overturned on appeal unless an abuse of discretion is clearly shown. Connelly, 94-0527, p. 5 (La.App. 1st Cir. 10/7/94), 644 So.2d at 793. Great deference must be accorded to the trial court's decision, not only because of that court's better capacity to evaluate witnesses, but also because of the proper allocation of trial and appellate functions between the respective courts. Bagents v. Bagents, 419 So.2d 460 (La.1982). Each child custody case must be decided based on its own particular circumstances. Connelly, 94-0527, p. 4 (La.App. 1st Cir. 10/7/94), 644 So.2d at 793. We cannot say that the trial court abused its discretion in awarding joint custody to the father and the grandmother.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are to be paid by Mark D. Swinford.
AFFIRMED.
WHIPPLE, J., concurs in the result.
NOTES
[1] We note that the pleadings signed by Ms. Rupert indicate that her first name is actually "Aimee" and not "Aimie."
[2] Former LSA-C.C. art. 146B stated, in pertinent part, "Before the court makes any order awarding custody to a person or persons other than a parent without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interest of the child." (emphasis added). LSA-C.C. art. 146B was in effect from January 1, 1983 until December 31, 1990, when it was redesignated as LSA-C.C. art. 131B. Acts 1982, No. 307, § 1; Acts 1990, No. 1008 § 8, Acts 1990, No. 1009, § 10. LSA-C.C. art. 131B was in effect until December 31, 1993. Acts 1993, No. 261, § 1 and § 12.