5 So.3d 989 (2009)
Denise Oden Nee HOWARD, Plaintiff-Appellant
v.
Frederick L. ODEN, Jr., Defendant-Appellee.
No. 44,191-CA.
Court of Appeal of Louisiana, Second Circuit.
February 25, 2009.
Rehearing Denied April 2, 2009.
*991 Richard L. Fewell, Jr., for Appellant.
Shawn D. Akers, for Appellee.
Before GASKINS, CARAWAY and MOORE, JJ.
GASKINS, J.
The mother, Denise Oden, appeals from a trial court judgment which held her in contempt of court for the third time. Because of the mother's repeated and willful failure to follow the court's order disallowing contact between her children and the man she has now married, the trial court found her in contempt and granted primary domiciliary custody of her children to their paternal grandfather. For the reasons set forth below, we affirm the trial court judgment.
At the outset, we believe it is important to note that the difficulties with the children's custody in this matter appear to emanate from the troubling behavior of their father, who has mental health problems, and the inability of their mother to provide them with a safe and stable environment. Postseparation and postdivorce, the mother had primary custody of the children, but her inability to care for them emotionally was so troubling that the Office of Community Services/Child Protection monitored her parenting skills and the trial court ordered counseling. The trial court has provided significant supervision of this case and has found the mother to lack credibility and to be defiant of court orders. Some of the problems that have afflicted the extended family have been instigated by the mother. Despite the aim of the Office of Community Services/Child Protection and the trial court to stabilize the children's environment, the mother introduced a disruptive presence into her home, her boyfriend (now husband) Chad Smith. It is the trial court's attempt to bring equilibrium to the children that has resulted in the court finding the mother in contempt of court for the third time and in the consequent change of custody.

FACTS
The mother married Frederick (Rick) L. Oden, Jr., in 1988. The parties had three children: an adopted son, Steven, who was born in 1993; a daughter, Emilee, born in 2000; and a daughter, LeighAnn, born in 2003.
The mother filed a petition for divorce in January 2005, in which she alleged both spousal and child abuse; she sought primary care and custody of the children. In a judgment dated April 20, 2005, the mother was awarded primary custody of the children subject to the father's specified visitation and an attached joint custody plan.
The parties were divorced in September 2006. To say that the relationship between the parents became toxic is a gross understatement. The record is replete with evidence of numerous police contacts involving both parties, documenting a wide variety of conflicts. They ranged from physical confrontations between the parties and/or their relatives to physical abuse of one of the children to accusations of trespassing, improper communications, stalking, harassment, and theft. The record *992 clearly demonstrates that the father suffers from mental illness and that his contacts with the children should be supervised; generally, this supervision has been provided by the paternal grandparents, Frederick (Fred) and Paula Oden. The record also establishes that the couple's son has behavior and emotional issues which led to his residing during the week with the paternal grandfather, who homeschooled him.
The mother's relationship with her boyfriend, Chad Smith, became an issue in the custody proceedings. In fact, the third hearing officer conference (HOC) report  which was dated March 21, 2007, the date of the conference  contained the following provisions in the portion containing the hearing officer's recommendations on interim custody and visitation:
2. Mother shall allow no contact whatsoever between the children and her current boyfriend, Chad Smith. He is not to be allowed in the home if any of the children are present. He is not to speak to the children by phone or in writing. The "paddle" made by Chad Smith shall be destroyed. The mother shall allow no "parenting" input whatsoever from Chad Smith. The mother's past practice of allowing him to whip or spank or otherwise discipline the children is completely unacceptable. Violation of this provision shall be grounds for immediate removal of the children from her custody, and by punishment as contempt of court. [Emphasis theirs.]
A. This recommendation had already been arrived at prior to the HOC, based on the information provided by Dr. [Mark] Vigen's report. However, his behavior at the conference should be noted.
1. The undersigned [hearing officer Lisa Rogers Trammell] had asked court security to keep an eye on things, given the past volatility of the parties. Lt. Walt Hendry periodically walked through the hallway and checked on the various groups of participants.
2. At approximately 2:30 p.m. the hearing officer's assistant advised that Mr. Smith had commented to her that he did not appreciate "that security guard" looking into the conference room, and that if the "security guard" popped off to him one more time, he was going to "tie into" him. The hearing officer at that time personally informed Mr. Smith that his presence was no longer welcome and he was to wait outside in the hallway. The bailiffs were then alerted to his comments and told to take whatever measures they deem appropriate to keep order and to handle the threat made by Mr. Smith.
The parties accepted all interim recommendations; pursuant to their stipulations, the trial court signed an interim judgment adopting the interim recommendations on March 28, 2007.[1]
*993 Following the fourth HOC on June 11, 2007, a report was issued. The hearing officer concluded that the mother was "only marginal" in her ability to parent the daughters and unable to parent the son at that time; all of the experts agreed that she needed "continued extensive therapy and parenting training." The hearing officer noted that one of the goals it was hoping to achieve was keeping the children out of foster care. Again, there were issues pertaining to Chad Smith. The following recommendation was included:
7. As ordered last time, Mother shall allow no contact whatsoever between the children and her current boyfriend, Chad Smith. He is not to be allowed in the home if any of the children are present. He is not to speak to the children by phone or in writing. The "paddle" made by Chad Smith shall be destroyed. The mother shall allow no "parenting" input whatsoever from Chad Smith. The mother's past practice of allowing him to whip or spank or otherwise discipline the children is completely unacceptable. Violation of this provision shall be grounds for immediate removal of the children from her custody, and by punishment as contempt of court. [Emphasis theirs.]
A. It is alleged that Mother has violated this provision by allowing Chad Smith to attend a ballet recital for the girls, and by constantly bombarding the children with messages about what Chad is doing, and how much he loves them, et cetera. There are also reports Chad and mother's brother Danny have been harassing the Father, substantiated by a police report. The mother's brother was arrested on an outstanding warrant.
1. All the involved parties concur that this incident culminated in the Father displaying a rifle. This sort of provocation of the father by the mother's brother and boyfriend, when he is clearly unstable, contributes greatly to the danger level of all parties, including the children. The under-signed [hearing officer] is satisfied that the mother is in contempt of court for violating the "no contact" provision regarding Chad. The mother is sentenced to 90 days in jail, suspended, conditioned on her immediate cessation of any contact with the children and Chad Smith, including her own efforts to make Chad a constant presence by telling the children how much he loves them, et cetera. SINCE THIS CONCEPT SEEMS DIFFICULT FOR HER TO UNDERSTAND, IT WILL BE PUT IN SIMPLE WORDS: ONE MORE VIOLATION AND SHE WILL BE DOING 90 DAYS IN THE MOREHOUSE PARISH DETENTION CENTER WHILE ALL THREE CHILDREN STAY WITH THE PATERNAL GRANDPRAENTS [sic]. Compliance will be reviewed at the next status conference and sentence executed if necessary. [Emphasis theirs.]
A judgment adopting the hearing officer's recommendations was signed on June 27, 2007.
Following the fifth HOC on August 13, 2007, the hearing officer reviewed the facts that she had seen this family five times in 10 months and enlisted the assistance of various agencies, all of whom had "made exhaustive efforts to keep the children from going into foster care." While the children seemed "comparatively" stable, she noted that the adults were not. As *994 she felt a full trial on all issues was unavoidable, the hearing officer recommended that no more HOCs be held. In the meantime, she recommended that domiciliary custody of the children remain with the mother, subject to the special provisions for time with the paternal grandfather and the father's supervised visitation. Again, the hearing officer placed in her recommendations the same prohibition of contact between Chad Smith and the children. She also noted that the mother was still subject to a 90-day suspended sentence as a result of her prior violation. Pending final disposition, the trial court adopted the HOC report as its interim order by judgment signed on August 21, 2007.
Beginning in early 2008, a nine-day trial was held. At its conclusion, the trial court issued a judgment wherein it awarded joint custody of the three children to the mother and the paternal grandfather. The custody plan provided for the daughters to reside primarily with the mother and the son with the grandfather. A weekend visitation schedule was established by which the mother would not have visitation with all three children on the same weekend. However, the court provided that this could be modified at a later date upon the recommendation of the parenting coordinator, Tamara Thompson of Family Matters. The mother was also awarded visitation with the son on Tuesday evenings.
On the issue of contempt and the mother's refusal to obey the court's directive to keep Chad Smith away from the children, the judgment contained the following:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the findings of contempt and sentence of ninety days in jail previously instituted by the Hearing Officer are affirmed; additionally, the Court finds that Denise Oden allowed contact between the children and Chad Smith since the time of the fifth hearing conference and, accordingly, holds Denise Oden in additional contempt of court and sentences Denise Oden to an additional ninety (90) days in the parish jail, said additional ninety-day sentence to run consecutively to the previously existing ninety-day sentence imposed by the hearing officer and affirmed herein. Said sentences of jail time, totaling 180 days, are suspended contingent upon immediate cessation of violations of the court's orders and payment of all costs of these proceedings by Denise Oden.
During the hearing at which the court made the above rulings, the trial court addressed numerous matters. Among these were the mother's credibility, which it found "severely challenged" on several matters. Although she denied contact between the children and Chad Smith, the evidence had revealed that they were sharing the same babysitter and that the mother dropped her daughters off at Smith's house every morning to catch the school bus. The court noted that even her own mother contradicted some of her testimony about the children's contacts with Chad Smith. It also questioned her judgment in repeatedly and flagrantly violating the contact prohibition, especially in view of the possibility of losing her children as a result. Given the son's emotional problems and his issues with anger/aggression, the court was particularly disturbed by the boy's contacts with Chad Smith and his family, which included shooting at dogs on a deer hunting excursion and disturbing photos involving the child and a slaughtered deer. The court stated:
I don't know what to do to make you understand ma'am that this is serious. Your own selfish desires with this guy need to be put aside out of the best *995 interest for your children to work through these issues.
The judgment containing the mother's second contempt citation was signed on May 8, 2008. Only 17 days later, on May 25, 2008, the mother married Chad Smith. Approximately a week after the wedding, she allowed him to move into the home where her daughters resided with her.
On June 27, 2008, the father filed a motion for contempt and modification of custody. The father brought the mother's marriage to the court's attention. He requested that she be held in contempt again and that sole custody of the children be awarded either to him or to the paternal grandparents.
The contempt matter came before the court for hearing on August 11, 2008.[2] Ms. Thompson, the family's parenting coordinator, testified that the mother did not tell her of her plans to marry. She stated that she did not find out about the marriage until three weeks before the contempt hearing. In view of the court order directing that the mother be sent to jail if she allowed Chad Smith around the children, she thought the mother's action in marrying him was "really risky." She also testified that the daughters had already related to her an incident since the marriage when Smith  despite the court's repeated orders that he was to play no role in disciplining the Oden children  picked up one of the girls and threw her on her bed and threatened to spank her. She described his behavior in throwing the child on the bed as inappropriate. Following Ms. Thompson's testimony, the court found that a prima facie case of contempt had been established.
The trial court allowed the mother to present evidence of mitigation. However, the first witness she called, psychologist Dr. E.H. Baker, testified that even though he saw the mother on May 26, 2008, she failed to tell him that she had gotten married the day before. She did not inform him of the marriage until she saw him on July 23, 2008, at which time she mentioned the instant contempt matter. Dr. Baker said he had spoken to Smith once for about five to six minutes. He was concerned that Smith was only 26 years old and had already been married twice before; he also had a child from each of those marriages.
Smith testified that he had custody of his two daughters, ages four and eight. He denied punishing the Oden children in any manner except verbally. He said his relationship with the Oden children was "lovely" and that he did not have any reason to favor his children over them.
Fred and Rick Oden also testified. Primarily they were asked about the emotional health of Paula Oden, the paternal grandmother. Fred, the paternal grandfather, testified that she had experienced hallucinations and had reactions to her medications. She was currently living with another one of their sons elsewhere, and he stated that he would not let her be around the children until her mental health issues had been resolved. He stated that he had no reservations about caring for all three of his grandchildren if necessary. Rick testified that he was continuing with his counseling and that he was *996 willing to help his father with the children at any time.
The mother testified that she thought the court orders prohibiting Smith from being around the children only had to do with his status as her "boyfriend." She insisted that her new marriage to Smith had stabilized her family. She stated that she did not tell Dr. Baker about the marriage when she saw him the day after the wedding because they "ran out of time" in her appointment. She testified that Smith was quiet and did not have a bad temper; however, she conceded that he was not nurturing. She admitted that Steven was doing well in the care of the paternal grandfather; she even requested that the current custody situation be allowed to continue.
In its oral ruling, the court emphasized that the counselors involved with the Oden family felt that the mother needed to put aside her personal relationship and focus her emotional energies on the situation with the children. It noted her continuing credibility and judgment problems and expressed concern about her failure to tell Ms. Thompson or Dr. Baker about the marriage. The court also expressed concern about Smith throwing the child on the bed and threatening to spank her when there was a prohibition against his administering any discipline to the Oden children. Given the mother's own admission that Smith was not a nurturing person, the court wondered at her exposing her children to someone like him when the children were in such need of nurturing and kindness. The court found that the addition of Smith and his two daughters to the mother's household had undermined the ultimate goal of reuniting the three Oden children.
The court sentenced the mother to yet another 90 days in jail; because she would lose her job as a school teacher if she had to go to jail, the court again suspended her sentence. This suspension was subject to her abiding by the prohibition against contact between her children and Smith and her continuing counseling. The court also removed the daughters from her custody and, due to the best interest of the children, designated the paternal grandfather as their primary domiciliary caretaker. She was given weekend visitation with her children with the exception of every third weekend; that weekend they were to stay with the grandfather so they could have visitation with their father. The mother's visitation was premised on Smith and his daughters not being present so that the mother could focus on her relationship with her own children.
Judgment in conformity with this ruling was signed September 11, 2008. The mother is now subject to three consecutive sentences of 90 days, or a total of 270 days, which are suspended contingent upon her immediate cessation of violations of the court's orders.
The mother now appeals from the September 11, 2008, judgment.

CONTEMPT

Law
A contempt of court is any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority. La. C.C.P. art. 221. The willful disobedience of any lawful judgment or order of the court constitutes a constructive contempt of court. La. C.C.P. art. 224(2). To find a person guilty of constructive contempt, it is necessary to find that he or she violated the order of the court intentionally, knowingly, and purposely, without justification. In re S.L.G., 40,858 (La.App. 2d Cir.1/25/06), 920 So.2d 363.
*997 The trial court is vested with great discretion in determining whether a party should be held in contempt for disobeying the court's order and its decision will only be reversed when the appellate court can discern an abuse of that discretion. Stephens v. Stephens, 30,498 (La. App. 2d Cir.5/13/98), 714 So.2d 115. A proceeding for contempt in refusing to obey the court's orders is not designed for the benefit of the litigant, though infliction of a punishment may inure to the benefit of the mover in the rule. The object of the proceeding is to vindicate the dignity of the court. In re S.L.G., supra.
La. C.C.P. art. 227 specifies that the punishment which a court may impose upon a person adjudged guilty of contempt of court is provided in La. R.S. 13:4611. That statute provides, in pertinent part:
Except as otherwise provided for by law:
(1) The supreme court, the courts of appeal, the district courts, family courts, juvenile courts and the city courts may punish a person adjudged guilty of a contempt of court therein, as follows:
. . . .
(d) For any other contempt of court, including disobeying an order for the payment of child support or spousal support or an order for the right of custody or visitation, by a fine of not more than five hundred dollars, or imprisonment for not more than three months, or both.
. . . .
(f) A pattern of willful and intentional violation of this Section, without good cause, may constitute a material change in circumstances warranting a modification of an existing custody or visitation order.

Discussion
In brief, counsel for the mother claims that, as a lay person, she might have interpreted the trial court's several prohibitions against Smith being around the children as being related to his "status" as her boyfriend, a situation remedied by making him her husband. Such a contention flies in the face of the overwhelming evidence. The record clearly shows that the orders barring Smith from the children were tied not to his status as a boyfriend, but to him inherently.[3] We note his actions, which included inappropriate punishment of the Oden children and the construction of a "paddle" for that purpose. The record shows that he also engaged in questionable behavior directed at the mentally ill father, as well as a court security officer at the third HOC. Furthermore, the court, relying upon the psychologists evaluating the family, believed that the mother needed to concentrate all her attention upon the serious problems involving her own children, especially her very troubled young son. The stresses of embarking upon another marriage  which came laden with two stepchildren  could hardly be construed as conducive to dealing with the problems that already existed in the mother's life pertaining to her first failed marriage and the children of that union.
If the mother felt that the court orders prohibiting contact between Smith and the children were erroneous, she should have sought review of them. However, until this  her third contempt citation for the same offense  she has never appealed any judgment that incorporated the no-contact order or found her in contempt. Nor did *998 she even file an objection to the HOC recommendations that Smith be barred from being around the children. Instead, the mother opted to simply ignore the orders and act as though they did not exist.
The sentence of 90 days imposed by the trial court is within the perimeters of La. R.S. 13:4611(1)(d). Given her pattern of blatant disobedience of the court's no-contact order and the extreme manner by which she chose to violate the order this time  marrying the man prohibited from being around her children and moving him and his family into her home with her and her children  we cannot say that the sentence is excessive. However, as on the mother's two previous contempt citations, the trial court mercifully chose to suspend the sentence so that the mother would not lose her job. A person found to be in contempt has no right to a suspension of sentence, but, in fact, is the beneficiary of the court's clemency when such a suspended sentence is imposed. Wicker v. Wicker, 373 So.2d 210 (La.App. 4th Cir. 1979); Goins v. Goins, 437 So.2d 947 (La. App. 2d Cir.1983).
Additionally, we find that the record supports a finding that the mother engaged in a "pattern of willful and intentional violation ... without good cause" which, pursuant to La. R.S. 13:4611(1)(f), may be considered as a material change in circumstances warranting a modification of the existing custody order. The change of custody ordered by the trial court will be discussed infra.
We find no abuse of the trial court's much discretion in finding the mother is contempt and in giving her a suspended sentence of 90 days.

CUSTODY

Law
The best interest of the child is the guiding principle in all custody litigation. La. C.C. arts. 131 and 134; Myles v. Moore, 36,452 (La.App. 2d Cir.8/30/02), 827 So.2d 516. In a conflict between parents and nonparents, the parent enjoys the paramount right to custody of a child, and may be deprived of such right only for compelling reasons. Tennessee v. Campbell, 28,823 (La.App. 2d Cir.10/30/96), 682 So.2d 1274; Myles v. Moore, supra. At an initial custody contest between a parent and a nonparent, the burden of proof is on the nonparent to show that granting custody to the parent would be detrimental to the child, and that the best interest of the child requires an award of custody to the nonparent. However, after an initial considered decree, the parent's paramount right to custody must be weighed in conjunction with the principles expressed in Bergeron v. Bergeron, 492 So.2d 1193 (La. 1986). Tennessee v. Campbell, supra. See also Myles v. Moore, supra. When a trial court has made a considered decree of permanent custody, the party seeking a change in custody bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child. Bergeron, supra. A considered decree is one in which evidence as to parental fitness to exercise custody is received by the court. Tennessee v. Campbell, supra; Bragg v. Horne, 33,857 (La.App. 2d Cir.6/21/00), 764 So.2d 1177.
La. C.C. art. 133 provides:
If an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a *999 wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment.
Comment (c) to this article provides that an award of joint custody to nonparents is not precluded, citing Schloegel v. Schloegel, 584 So.2d 344 (La.App. 4th Cir.1991); in that case, an award of joint custody between the child's father and the maternal grandmother was upheld as within the trial court's discretion. See also Matter of Landrum, 97-826 (La.App. 3rd Cir.12/10/97), 704 So.2d 872; Robert v. Gaudet, 96-2506 (La.App. 1st Cir.3/27/97), 691 So.2d 780; and Rupert v. Swinford, 95-0395 (La.App. 1st Cir.10/6/95), 671 So.2d 502. However, see also Merritt v. Merritt, 550 So.2d 882 (La.App. 2d Cir. 1989); like Schloegel, supra, this case dealt with La. C.C. art. 133's pre-1993 amendment predecessors.

Discussion
Joint custody between the mother and the paternal grandfather was awarded in the judgment signed in May 2008.[4] The mother did not appeal that judgment, which was rendered after a nine-day trial and therefore is a considered decree. Since La. C.C. art. 133 addresses initial awards of custody to nonparents, it is inapplicable in the instant matter.
The mother concedes application of the Bergeron standard after a considered decree, i.e., proof that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.
We note at the outset that pursuant to La. R.S. 13:4611(1)(f), the mother's "pattern of willful and intentional violation... without good cause" may be considered as a material change in circumstances warranting a modification of the existing custody order. Indeed the mother was repeatedly warned in the HOC recommendations, which were adopted by the trial court as its judgments, that violation of the no-contact provision "shall be grounds for immediate removal of the children from her custody." We cannot imagine a more blatant and substantive violation of this order than marrying the person ordered to have no contact with her children and moving him into the children's home where daily contact with them is completely unavoidable.
The Oden daughters said some positive things about Smith to Ms. Thompson. However, they also revealed that although the mother was ordered not to allow Smith to discipline the children, he had thrown one of the girls on a bed and threatened to spank her. While Smith denied any physical *1000 discipline of the girls, Ms. Thompson testified that the mother recalled and confirmed the occurrence of this incident to her. As the family's parenting coordinator, Ms. Thompson believed that this was not appropriate discipline. It is noteworthy and troubling that this event occurred so soon after Smith moved into the mother's home. In light of the information in this record pertaining to Smith previously "disciplining" the Oden children, the trial court's apprehension on this issue appears to be justified. Prior judgments called for the destruction of a "paddle" he made for use on them.
The mother resided in a three-bedroom, two-bathroom trailer home; however, only one bathroom functioned. Prior to her marriage to Smith, her two daughters shared a bedroom while she and her son each had a bedroom. Since the marriage, the mother and Smith share a bedroom, while their eight-year-old daughters share another bedroom. The bedroom that formerly belonged to her son is now shared by the couple's four-year-old daughters. When the son is present, he is relegated to a bed in the corner of the playroom or the bed of one of his absent sisters.[5] The trial court expressed concern as to this emotionally fragile boy being forced out of his own room due to the addition of Smith's daughters to the household.
The paternal grandfather testified that at his residence each child has his or her own bed. He also testified that he would put the needs of his grandchildren first. As to the unfortunate situation with his wife's health issues, he testified that he was insisting that she obtain the professional help that she needed but that she was not allowing him to help her at that time. He was adamant that he would not let her return home until she addressed her issues so that the children would be safe.[6] As to the quality of care the grandfather is able to give the children, even the mother admitted that her son was doing well with him. The record shows that the grandfather homeschooled this troubled young boy and gave him the stability he needed; the child has now been able to enroll in a private school.
The record before us indicates that the trial court originally allowed the mother to enjoy joint custody of the children with the paternal grandfather after she declared her intention to comply with the orders pertaining to Smith for the good of her children. In view of the serious questions surrounding the mother's relationship with and now her subsequent marriage to Smith, her repeated and blatant violations of a court order prohibiting this man from any contact with her children, Smith's own actions in "disciplining" the children despite repeated court orders to abstain from such actions, the need of her children (especially her emotionally fragile son) for her undivided attention when they are with her, and the current living arrangements, we find that the trial court did not err in finding that continuation of the current situation was so deleterious as to now warrant changing primary domiciliary care of the Oden daughters from the mother to the paternal grandfather.
It is clear from the manner in which the trial court handled this matter that the change of custody is not the trial court's infliction of a punishment upon the mother for her disobedience of its orders; rather *1001 it is a sad acknowledgment of the fact that the mother has repeatedly shown that she does not have the best interest of her children at heart. The trial court properly directed the mother to continue with counseling, which will hopefully be helpful in future assessments of this difficult ongoing custody matter.[7]

CONCLUSION
The judgment of the trial court is affirmed. Costs of this appeal are assessed against the mother, Denise Oden.
AFFIRMED.
CARAWAY, J., dissents with written reasons.
CARAWAY, J., dissenting.
I respectfully do not accept the majority's characterization of this custody dispute because of all that is missing in the record before this court. The case is depicted as teetering on the edge of a child in need of care proceeding; yet the Office of Community Services/Child Protection agency has not been asked to intervene. Upon the motion of the mentally ill father, the present custody ruling virtually ends the parental rights of the mother in favor of a nonparent who is not a party to this action. The testimony of the nine-day trial which concluded in February 2008 maintained the mother's parental rights and primary custody of the two daughters, yet that evidence in her favor is not in the appellate record. Mr. Smith is not a felon; he is the custodian of his own children; and he has never been the subject of a child protection agency review. The issue of the mother's right to marry such person was never directly addressed and prohibited by the prior proceedings, and yet has now become the linchpin for the termination of the parental rights. The mother's conduct which resulted in her loss of custody was not measured by the trial court under either Civil Code Article 133  "substantial harm" to the children  or the Bergeron test  "so deleterious" to the children. The trial court's ruling articulated neither standard and was primarily based upon the newly pronounced prohibition upon the mother's right to marry and the corresponding ex post facto imposition of contempt. Therefore, I am not prepared to end the mother's parental rights in favor of a nonparty to this action under these circumstances and the record before us.
Under La. C.C.P. art. 927, the court may notice on its own the peremptory exception involving the nonjoinder of a party. Had Mr. Fred Oden been made a party and sought custody under La. C.C. art. 133, the custody ruling in his favor might have been properly adjudicated with a specific determination that custody in Denise Oden "would result in substantial harm to the children." Procedurally and substantively, this did not occur. I would therefore reverse the rulings of the trial court on those procedural and substantive grounds.
APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, GASKINS, CARAWAY and MOORE, JJ.
Rehearing denied.
WILLIAMS and CARAWAY, JJ., would grant rehearing.
NOTES
[1] At the time of the third HOC, the psychologists evaluating the parents raised the possible necessity of placing the children in foster care because of fears that neither parent was able to provide suitable care. The hearing officer requested that an alternate recommendation to foster care be developed, which recommendation was thereafter implemented with some modifications. While the mother had domiciliary custody of the three children, the paternal grandparents were given physical custody of Steven during the week with visitation with the girls every other weekend. The paternal grandfather assumed the responsibility of homeschooling Steven. The father was not allowed any contact with the children at that point. As "gatekeepers," the grandparents agreed to honor the court's order and permit their son no contact with the children until directed otherwise.
[2] Although the mother filed a pleading entitled "Answer to motion for contempt and for motion of custody order and exception of failure to state a cause of action and reconventional demand and third party claim for contempt and modification of custody order," the court ruled that it was not before the court when the motion to hold the mother in contempt was called up.
[3] When the mother made this argument before the trial court, the judge reminded her of a previous appearance before him when she tearfully asked not to be placed in jail and said she would do what was in the best interest of her children and "cut it off" and not see Smith anymore.
[4] Although the grandfather was not a party to the custody dispute, this technicality does not prevent an award of custody to him. See Stuckey v. Stuckey, 276 So.2d 408 (La.App. 2d Cir. 1973); Roller v. Roller, 213 So.2d 161 (La.App. 3rd Cir. 1968); Schloegel, supra; Nail v. Clavier, 1999-588 (La.App. 3rd Cir. 11/10/99), 745 So.2d 1221, writ denied, XXXX-XXXX (La. 1/5/00), 752 So.2d 169; Miller v. Miller, XXXX-XXXX (La.App. 3rd Cir.2/2/05), 893 So.2d 233. See also Hall v. Hall, 367 So.2d 162 (La.App. 2d Cir. 1979), which held that where the proper standard of proof regarding the parents' conduct has not been met, custody cannot properly be awarded to a nonparent especially one in whom custody has not been prayed for by either parent or who is not a party.

Here, the fourth HOC report noted that the paternal grandfather was "not technically a party" but had been identified as a resource by some of the psychologists and Child Protection; the report states that "everyone consented to his involvement as an alternative to foster care."
[5] Under the visitation schedule then in place, the boy only spent the night with the mother when his sisters were visiting with the grandfather.
[6] Ironically, the mother criticizes the grandfather for taking this position and essentially doing what she herself refuses to do  placing the children and their well-being before his marriage.
[7] At some point in the future, the court may even find it beneficial to include the mother's current husband in such counseling.