GARRETT, J.
11 Richard Russell Hogan (“Russ”) appeals from a trial court judgment which awarded interim' spousal -support in favor of his former wife, Jill Adams Hogan, in the amount of $3,800 per month and ordered' that it be paid beyond the statutory 180-day period. Russ also appeals the portion of the judgment ordering him to provide major medical insurance coverage with a deductible not greater than $500 per year for each of his two children with Jill. We affirm the trial court judgment.
*1015 INTRODUCTION
Contested domestic cases are never amicable. However, what occurred in -this case is beyond the pale. To understand why we are affirming the decisions made below, especially the extension of the period of time for payment of interim spousal support, it is — unfortunately—necessary to review in detail the factual and procedural' background leading up to the protracted hearing and the evidence adduced at that hearing. Unlike many domestic cases that take years to resolve and are handled by multiple judges, this case is somewhat unique. The same judge presided over this matter from the beginning through all the events resulting in the instant appeal.[1] Thus, the trial court had the full benefit of being well versed and completely familiar with the entire sordid picture and all of the machinations that occurred before, during, and after the dissolution of the parties’ marriage.
J^FACTUAL AND PROCEDURAL BACKGROUND
Russ and Jill married in Ruston in September 2007. Two children were born of this marriage: a son (DOB 12/09), and a daughter (DOB 12/10). It was Jill’s first marriage and Russ’s second. He had another daughter from his first marriage, who was about 10 years older than his son with Jill. Unfortunately, the parties’ marriage was marred by Russ’s repeated infidelities, substantial substance abuse, and reckless financial shenanigans.
When the parties met in 2005, Russ was an agent for American Family Life Assurance Company (AFLAC). In February 2007, Jill — who had been working for' a medical supply company — got her license to sell insurance and began working for AFLAC also. By this time, Russ had been promoted to district sales coordinator (DSC). However, due to their relationship and the respiting conflict of interest, Jill had to cultivate her own clients without his assistance. Later that year, Russ was promoted , to regional sales coordinator (RSC); his region covered a large portion of North Louisiana'. Due to an extramarital affair with one of his insurance agents and lying to his boss, Russ lost his position as RSC in early 2010. The couple briefly separated due to Russ’s cheating, but reconciled. In March 2010, Russ accepted a DSC position in Jacksonville, Florida, and the family moved there in April 2010. However, during her pregnancy with their daughter, Jill had to move back to Louisiana to maintain her medical insurance coverage with Blue Cross/Blue Shield of Louisiana. She and their son moved in with her mother in Monroe in August 2010. Wfliile Jill | awas away, Russ engaged in an affair with a woman named Julia. He was also frequenting ‘ strip clubs and using drugs. By his own admission at trial, he was “definitely spending lots of money” during this time period. In February 2011, Russ decided to take a DSC position in Orlando, a fact that Jill learned only when she read about it on Russ’s Face-book page. Jill made plans to pack up the Jacksonville house for the'move to Orlando. -However, on March 16, 2011, Jill learned of Russ’s affair with Julia after calling a frequently dialed number she found on Russ’s cell phone records.
Jill filed for divorce on March 18, 2011, in Ouachita Parish. - She sought joint custody of the children and designation as the domiciliary parent. She' also requested interim spousal support and, upon its termination, final periodic spousal support. When Jill traveled to Jacksonville with her father to retrieve household and personal belongings, she discovered that Russ had *1016 taken most of these items; she later learned that he had placed them in storage under the name of yet another woman.[2]
Instead of answering Jill’s petition, Russ filed his own suit in Ouachita Parish for divorce three months later. Jill filed an exception of lis pendens in Russ’s suit, which was granted by judgment signed on July 22, 2011, as to all incidental matters, but not as to his cause of action for divorce.
On July 27, 2011, Jill filed an amended petition for divorce, in which she alleged in detail Russ’s adultery with various women and the “double life” he led during their marriage. Jill recounted how insurance coverage. I Jssues forced her to stay in Monroe while pregnant with their daughter and how she later learned about his activities in Florida during her absence, She asserted that, during this time period, Russ had minimal contact with his family, missing holidays on the ground that he could not afford to travel to Louisiana to see them. However, during the same time period, he spent significant funds on alcohol, drugs, and strip clubs. She alleged that in March 2011, Julia confirmed her relationship, with Russ and provided Jill with hundreds of texts and photos, documenting a lengthy affair and Russ’s reckless lifestyle, which allegedly included the daily intake of excessive alcohol apd the use of multiple drugs, such as cocaine, Lortab, marijuana, crystal meth, Xanax and Adderall.
Jill further asserted that she and her family had provided for all of the children’s care and financial support since March 2011, and that Russ had terminated the children’s health insurance coverage.[3] She further alleged that Russ had issues with alcohol. She expressed concern as to the children’s safety in their father’s custody, particularly in light of the people with whom he. associated. She requested drug testing under La, R.S. 9:331.1. On the issue of physical abuse, Jill alleged several episodes of violence, including some which occurred when she was pregnant. She sought relief under La., R.S. 9:364 of the Post-Separation Family Violence Relief Act, which disqualifies a parent with a history of family violence from being awarded sole or joint custody of children and restricts visitation. J^She specifically requested that Russ be denied visitation with the children until after his completion of a treatment program.
While the divorce proceedings were in the early stages, Russ met Brandie Jager, a waitress in Mississippi who was 14 years his junior. A week after they met in May 2011, Brandie drove to Florida to stay with him. In June 2011, she moved into the $2,000-a-month furnished house he was renting in a gated community on an Orlando golf course. Brandie was unemployed, and Russ paid all her expenses and provided her with a cell phone. She later accompanied him on several luxurious trips— including one to Hawaii and another to Deer Valley, Utah, where they stayed at the St. Regis Hotel. They dined lavishly, both at restaurants and while entertaining at home. Russ bought Brandie expensive gifts, including $200 sunglasses. He also treated himself to such amenities as $200 sunglasses and a couple of $600 tattoos.[4] *1017 In June 2011, Russ sent Jill a check for $500; it was the first money he had paid for his children’s-support since the divorce filing. In the meantime, Jill had been forced to apply for food stamps in order to feed their two young children and herself.
A hearing officer conference (HOC) was scheduled for July 28, 2011. However, after lengthy negotiations, counsel reached an agreement on issues -of custody, child support, and spousal support. The agreement included drug testing of Russ, the results of which were to be given to the hearing officer and filed under seal. Pursuant to this agreement, Russ was | fito sign off on an intrafamily adoption of the children by the maternal grandparents and Jill would waive all claims for financial support. Although he actually signed the adoption papers, Russ changed- his mind— apparently for reasons involving his parents — and, had his attorney .withdraw them.
Russ continued living with Brandie. In November 2011, Brandie opened a bank account in her name, into which Russ began depositing money. That same month, Jill’s car, a Dodge Charger given to her by Russ for Christmas 2009, was repossessed because Russ stopped making the payments on it. (He later-testified that he was “upset” with Jill and assumed she could borrow her mother’s car.) Also ifi November 2011, Russ quit his lucrative job in Orlando and moved back to Ruston to “fight [Jill’s] ass,”' as he declared in an email. Brandie accompanied him.
Another HOC was held on February 23, 2012. In her report, the hearing officer found that Jill would be. able to prove by clear and convincing evidence that the children’s welfare required an award of sole custody to her. She recommended only supervised visitation based upon evidence “strongly probative of heavy drug and alcohol use and a degenerate lifestyle that could not help but present a significant risk of harm to the children if unsupervised contact was allowed (emphasis hers).” The hearing officer also noted Russ’s “abysmal failure” to support the children beyond the single $500 payment. As to Russ’s income, the hearing officer split the difference on the amounts supplied by the parties and found his annual income to be $196,000 or $16,333 per month. The hearing officer noted that the children were on Medicaid and found that it was not in their [ 7best interest to rely on Russ for health insurance, given his unreliability in paying child support and his actions in canceling their previous insurance coverage. However, should the children be disqualified from Medicaid, the hearing officer recommended that Russ be required to insure the children with a reasonable annual deductible not to exceed $500 per child. Child support was set at $2,211 per month, retroactive to March 18, 2011, and child support arrearages were set at $26,532. As to spousal support, the hearing officer found that Russ had a monthly surplus of at least $5,385 and that Jill was nearly destitute and living with her mother. Finding that $5,000 was a reasonable amount for monthly living expenses and that Jill made $1,124 per month from some part-time work, the hearing officer set interim spousal support at $3,800 per month, which was also retroactive. Arrearages -for interim spousal support .were set and made executory in the sum of $45,600.
Both parties filed objections to the report. Jill objected to Russ receiving a tax exemption for the children because of the árrearages; . Russ not being ordered to maintain health insurance for the children; and the assessment of half the costs to her. Russ objected to the hearing officer’s statements about awarding sole custody , to Jill and only supervised visitation for him. *1018 He also claimed that the child support and interim- spousal support amounts were excessive and stated that he would provide health insurance coverage for the children. He also objected • to- the finding that an immediate income assignment order was . warranted.
On March 13, 2012, the trial court signed a temporary order making the HOC report the temporary order of the court, without prejudice, pending |sfmal disposition of the issues; the order was filed on March ■ 16, 2012. Trial on the objections was originally set for April 16, 2012.
On or about March 24, 2012, Russ gave Jill a check for $500. It was only the second time he had provided any funds for his children’s support since the March 2011 divorce filing. The amount of the check was well below the amount ordered by the, court, and it was the last support check he would ever write.
On April 3, 2012, Jill filed a contempt rule because Russ had only paid a total of $1,000 in support since March:.18, 2011. His arrearages at this time were estimated to be $27,743 in child support and $49,400 in interim spousal support.- The matter was set for April 16, 2012, the same day already set for the trial on the objections. However, Russ’s motion for continuance was granted, and the hearing was rescheduled for August 23,2012.
An immediate income assignment order for the child support directed to AFLAC was signed by the trial court on April 30, 2012. Another one, also for child support, was signed on. June 8,2012, but directed to Continental American Insurance Company (CAIC), a-division of AFLAC for which Russ also wrote insurance.[5]
• Despite his substantial arrearages, Russ continued to make large, frivolous purchases instead of paying his support obligations. In May 2012, Russ borrowed $10,000 to buy a Nissan Altima for Brandie. He admitted at Intrial that the monthly notes on Brandie’s Altima were higher than those on Jill’s repossessed Charger. Next -he spent $15,000 on a speedboat which, according to Brandie’s testimony, cost $100 every time they filled up the gas tank. The record also indicates that Russ bought a.used Jeep in May 2012 for $1,800 and then sold it at a loss for about $1,400 in August 2012. All of these purchases were financed by loans' obtained through AFLAC.
'On August 22, 2012, Jill filed more rules for contempt and motions to compel after depositions were given by Russ and Brandie. ■ Both Russ and Brandie were independent insurance agents for AFLAC in Ruston at this time,- Brandie having just passed the insurance exam in May 2012. Russ conceded in his deposition that, even though he had two bank accounts in his own name, he had diverted funds into Brandie’s bank account. Brandie admitted that Russ had also directed some of his clients .to her, which effectively diverted the income generated from them to Brandie and reduced his income. During her deposition, Brandie refused to. answer numerous questions and failed to produce any of the financial records subpoenaed.[6] *1019 Likewise, Russ had failed to supply relevant financial information on numerous occasions. Due to these efforts to frustrate discovery,, Jill was forced to request a continuance. Following a-hearing on August 23, 2012, the motion to. continue the trial on the objections was granted; it was later reset for December 20, 2012. The contempt proceedings were set for October 3, 2012. Brandie was ordered to produce the specified documents, l10and Russ was ordered to file his 2010 and 2011 income tax returns by September 21,2012..
In August 2012, Russ began working for Colonial Life & Accident Insurance Company (“Colonial Life”). Two months later, he got Brandie a job'there.
After a hearing on October 3,2012, Russ and Brandie were ordered to produce certain specified documents to Jill’s lawyer by October 22, 2012. On October 22, 2012, another immediate income assignment order' for child support was signed against Russ and directed to his new employer; Colonial Life. On October 24, 2012, Russ was held in contempt for his discovery failures. Although he was spared jail, he was ordered to pay $1,500 in attorney fees and the costs of the rule for contempt. Both Russ and Brandie were ordered to produce additional documents. Brandie was ordered to pay the costs of her second deposition. All trial exhibits were ordered to be made available to’ the other side by December 7, 2012. The trial was to commence on December 20, 2012, with additional trial dates on January 30, 2013, February 1, 2013, and February 20, 2013, if necessary.
On December 14, 2012, Russ’s attorney informed Jill’s counsel that Dr. Mark Vi-gen, a psychologist, would be called as a witness at the trial on December 20, 2012. Due to this, previously undisclosed witness and the failure of Russ’s counsel to forward- needed documents to a third party for copying, Jill was again forced to seek a continuance because of Russ’s discovery issues. The trial court granted the motion and continued the matter to February 1, 2013, a day already designated for trial, to allow Jill to conduct sufficient discovery as to Dr. Vigen’s testimony and to have the lunecessayy documents which she requested to be copied available for trial. Pursuant to a conference with counsel in February 2012,'the matter was reset for trial on July 8,9, and 10,- 2018.'
On February 21, 2018, Jill filed a motion for judgment of divorces. The rule to show cause why it should not be .granted was set for March 21, 2013. On .that date, Jill’s motion for divorce was granted and the judgment was signed. This judgment expressly provided that the temporary order signed on March Í8, 2012, ‘ and filed on March 16, 2012, would remain in full force and effect pending further' orders by the court. Russ filed no objection to this order, which required him to pay $3,800 per month in interim spousal support, among other obligations. .,
On March' 19, 2013, Russ .filed a motion to terminate the income .assignment orders, claiming that, since May 2012, the monthly child support was deducted pursuant to the April 2012 order and sent directly to Jill. He asserted that the subsequently filed income assignment orders had resulted in Jill receiving more than the child support obligation and that he was having difficulty paying his own expenses.[7] A hearing on the motion was held on April 26,' 2013, during which Russ stipulated that he was delinquent in paying his interim spousal support obligations. By order signed, on May 20, 2013, the trial *1020 court terminated the June 2012 (CAIC) and October 2012 (Colonial Life) income assignment orders for child- support. However, an order for the interim spousal support was issued and.directed to Colonial |12Life.[8] While the order provided for an amount of $3,800 per month, it was not to exceed 40% of Russ’s disposable income in compliance with La. R.S. 13:3881.[9] The April 2012 (AFLAC) income assignment order for the child support remained in place.[10]
In May 2013, Russ paid $1,600 cash for an engagement ring Brandie picked out at Zales. In June 2013, he signed up for a one-year membership at Anytime Fitness, agreeing to pay dues of $443.40, plus another $960.00 for a six-month personal trainer/nutrition program.
The matter finally came before the trial court on July 8, 2013, for trial on the parties’ objections to the HOC recommendations, for determination of custody, child support, and interim spousal support, and the contempt rules. Although custody had been at issue, a stipulation and agreement as to the custody and visitation issues was reached. Jill was awarded sole custody of the children.[11] A judgment memorializing the custody agreement was signed August 15, 2013.[12] It further held that the March 16, 2013, | ^temporary order as to Russ’s support obligations would remain unchanged as those issues and Russ’s objections thereto were still pending before the court.
Trial on the remaining — mostly financial — issues finally began on July 9, 2013, and continued ■ on' July 10, July 12, and November 22, 2013. Testimony was given by Russ, Brandie, and Jill, as .well as by the mother, and stepfather of Russ’s older daughter. Much of the information established through the testimony has been described above. Extensive financial evidence was received which demonstrated Russ’s history of poor financial management over the years and the extravagant, hedonistic, lifestyle he chose to live while his destitute wife and children struggled financially.[13] Jill testified that the children only had medical coverage through Medicaid, received WIC, and that at times they *1021 had been forced to rely upon food stamps. Also highlighted were Russ’s questionable income tax reporting and his failure to pay substantial tax debts. The evidence showed that Russ quit his lucrative DSC job with AFLAC in Florida -in November 2011, and moved to Ruston, where he worked initially as an AFLAC agent, making significantly less than he .had in Florida. During this period, he was still .tunneling large amounts of money and clients to Brandie, who also worked for AFLAC. At the time of trial, he was working- as a district general manager for Colonial Life, claiming to be making significantly less than he had in Florida. (He had also secured a | umanagement position for Brandie with his new employer.) Russ testified that he thought the garnishments were paying his child support and interim spousal support obligations. However, the monthly statements he received clearly showed that the full obligations were not being paid. Russ and Brandie also testified as to their standard of living, which included expensive purchases, as well as frequent outings to restaurants, hotels, spas, and various entertainment venues.[14] In fact, Brandie testified that they had discussed honeymooning in Costa Rica and were planning a seven-day trip to Nice, France, and Italy in April: 2014, for a Colonial Life leader’s conference.[15] At the conclusion of the 'evidence in November 2013, the trial court requested that, the parties file briefs. Jill’s comprehensive post-trial brief was filed on January 7, 2014; however, no post-trial brief for Russ is found in the appellate record.
On July 18, 2014, the trial court issued a lengthy written ruling. Although the issue of permanent periodic spousal support was not currently before the court, the trial court did note that the evidence reflected that Jill was not at fault in any way in the termination of the marriage. The court found, inter alia, that Jill needed interim spousal support in the amount of $3,800 per month,- and Russ had the ability to pay. The court also found that Russ was voluntarily underemployed and capable of earning at least the $16,333 per month used by the hearing officer. The court opined that Russ was able to earn in excess of $200,000 annually, but he engaged in “many |1Kschemes to [hide] income.” These “antics” included redirection of his income to Brandie; his failure to report income on his tax returns; his voluntary move from a higher paying job to a lower one; irresponsible purchases while in arrears and arranging to have the payments taken from his entitlement from AF-LAC/Colonial Life in order to frustrate the income assignment; failure to pay the note on Jill’s car, causing it to be repossessed, while supporting Brandie and buying her a car; and failure to provide health insurance to the children. Finding good cause under La. C.C. aft. 113, the trial court extended the interim spousal support beyond the 180-day post-divorce period and for as long as there is an arrearage due to Jill.
The trial court also found that it was “unacceptable for the children to have ever had to depend on Medicaid for insurance coverage.” Russ was ordered to provide major medical insurance coverage for the children, with a beginning date of August 1, 2014, and an annual deductible no greater than $500, with Jill paying the entire deductible.
*1022 Finding Russ in contempt, the trial court stated that his conduct warranted a sentence of 90 days-in jail, suspended with two years’ probation. As conditions of probation, the court ordered hto to pay $10,000 to- Jill toward his interim spousal support- arrearages of-$108,440.23 by August 31, 2014; pay Jill’s attorney fees of $4,000 and court costs by September 15, 2014; and serve four weekends in the Oua-chita Parish Jail. The court specified that these were conditions of probation and would not purge the contempt; To avoid serving the remaining 82 days of the sentence, Russ was ordered to fully comply with his child support and 11fiinterim spousal support payments, even-if the payments could not be satisfied through the income assignment orders.
Child support arrearages were set at $19,819.36 at time of trial and made execu-tory. Jill was allowed to claim both children for tax purposes. However, the court stated it would' consider modifying this provision once Russ became fully current on the child support arrearages.
Judgment in conformity with -the trial court’s written reasons was signed August 26,2014. Russ appealed.
INTERIM SPOUSAL SUPPORT
Russ contests several aspects of the trial court’s award of interim spousal support.
In a proceeding for divorce, the court may award an interim periodic support allowance to a spouse based on the needs of that spouse, the ability of the other spouse to pay, and the standard of living of the spouses during the marriage. La. C.C. arts. 111 and 113; Evans v. Evans, 49,160 (La.App.2d Cir.6/26/14), 145 So.3d 1093; Bickham v. Bickham, 46,264 (La.App.2d Cir.3/2/11), 58 So.3d 950.
The purpose of interim spousal support is to maintain the status quo without-unnecessary economic dislocation until a final determination of support can be made and until a period of time of adjustment elapses that does not exceed, as a general rule, 180 days after the judgment of divorce. A spouse’s right to claim interim periodic support -is grounded in the statutorily imposed duty on spouses to support each other during marriage and thus provides for the spouse who does not have sufficient income for his or her maintenance durin'g the period of separation. Evans, supra; I wBicMmrb, supra. -The needs of the claimant' spouse have been defined as the total amount sufficient to maintain her in a standard of living comparable to that enjoyed by her prior to the separation, limited only by' the payor spouse’s ability to pay. Bickham, supra.

Amount

.Russ argues that the trial court erred in its calculation of the interim spousal support award. He claims that the $3,800 interim spousal support monthly award was not a fair or reasonable assessment based on his income and, expenses at the time, of the 2013 trial. Nor was it .a proper calculation based upon his net (as opposed to his gross) income in February 2012, when the hearing officer set it. Russ objected to the trial court’s finding that he was voluntarily underemployed.
In order to demonstrate need for interim periodic spousal support, the claimant spouse has the burden of proving that he or she lacks sufficient income, or the ability to earn a sufficient incomé, to maintain the standard of living that he or she enjoyed during the marriage. Evans, supra. Once the claimant spouse has established need, the court must examine the ability of the payor spouse to provide support. Evans, supra; Bickham,' supra. The trial court is vested with much discretion in determining an award of interim *1023 spousal support. .Such a determination ■will not be disturbed absent a dear abuse of discretion. An abuse of discretion will not be found if the record supports the trial court’s conclusions about the needs of the claimant spouse or the means of the payor spouse and his or her ability to pay. Evans, su/prai Bwkham, mvpm. ■ ' •
liiiJill clearly proved that she was in dire need" of interim spousal support. During the marriage, the parties enjoyed a comfortable lifestyle that included travel. Although she had worked for AFLAC early in the marriage, she became a stay-at-home mom after their son’s birth and also acted as a frequent caregiver for Russ’s older daughter while the girl’s parents worked. At the time the divorce petition was filed, Jill was caring for the parties’ two very young children — -One of whom was just an infant. Jill’s ability to work" was further compromised by Russ’s callous actions in failing to pay the ear note on the ear he gave her and causing it to be repossessed, leaving her and the children without transportation. At the time of the separation, all of Jill’s household items and most of her clothing were at the marital home in Jacksonville. When Jill went to retrieve them, she discovered that Russ had taken and concealed most of her possessions (as well as many of the childrens items). The result of this petty and .vindictive ploy Was to place an additional— and completely unnecessary — financial burden on Jill, who had to replace these things for both herself and their children. Fortunately, Jill and the children were able to continue living with her mother. However, Jill had limited income to provide the basics of life, such as food, for herself and the children. After Russ failed to provide any financial support for them despite her numerous pleas, she was reduced to having to borrow money from family and Mends, pay for diapers with a credit card, and apply for public assistance. She and the children qualified for Medicaid, WIC and food stamps. Given the circumstances presented herein, Jill’s expenses as detailed at trial appear to be reasonable. .. •
|1ftA review of the record fully supports-the trial court ruling that, Russ has more than an'abundant ability, to provide, the needed support. It also shows the extremes to which he has gone to conceal his income, especially since Jill filed for divorce. His gross receipts from insurance sales were $200,688 in .2008; .$189,795 in-2009; $191,699 in 2010; $174,496 in 2011; and at least $121,777 in 2012. As of November 9, 2013, he. had renewal commissions of $6,969 from- CAIC, as well as-$56,909.06 from AFLAC as of October 31, 2013; and his year-to-date gross earnings from Colonial Life at the time of the hearing in November .2013 were $83,480.53. Thus, his documented gross income for 2013 was in excess of $147,358.
Although "Russ argues teat only his net income should be considered in computing interim spousal support, the'record reveals teat the figures he gave for his .net income — teoth at -the time it was originally set in 2012 and at. the 2013 trial — are totally unreliable. Even before the end of his marriage with .Jill, his tax reporting was questionable. He supplied tee, CPA who prepared his tax returns with just a list of expenses without any supporting documentation. During a withering and exhaustive cross-examination, Russ was forced to repeatedly admit that he had no records, receipts or cheeks to ■ support many of his reported expenses and deductions. After thé separation, Russ began reducing his reportable income by deducting “chargebacks’ — money advanced on a policy which is taken back if the policy lapses or is ¡cancelled — from his gross income." However,: Jill produced’ documentation from AFLAC proving that' charge- *1024 backs are already taken into consideration Isnon its 1099, forms.[16] Russ also failed to report when he cashed in his AFLAC stocks. In 2010, more than $22,000 in AFLAC stock was sold and more than $8,000 in 2011.
Both Russ and Brandie denied that he tunneled funds and clients through: her to avoid his support obligations. However, their actions — as revealed by the plethora of financial evidence presented in court by Jill — belie their self-serving denials.[17] They were both more candid with a woman whose home they rentéd in Ruston. Russ admitted telling his landlady that he was selling everything so his ex-wife couldn’t get anything, but- claimed he was joking. In a text message to the landlady, Brandie stated: -
I promise you we can afford it. It’s been tough with ‘Jill getting half, but that’s why I’m working for- aflac[. S]he can’t get half of my money. Thank you for being patient with us, and [I] promise we can afford this. We paid 2000 in Orlando for rent alone.
■ For the first year shé lived with Russ,' Brandie was unemployed and almost wholly supported by him.' After failing the insurance exam in Florida, she passed it in Louisiana and began selling AFLAC policies' in May 2012. Russ gave her numerous accounts; because she wrote the policies, she received income which would have gone to him and been reportable income. In fact, Russ admitted that it was “highly possible” that Lihe.did not write any insurance applications for 20 weeks after Brandie got her license. From June to Augus.t 2012, she received more than $10,000 from AFLAC. In October 2012, Russ got her a job- at Colonial Life where he was her supervisor. Again, Russ funneled clients to her, thereby reducing his own reportable income. From October to December 2012, she made $20,000 with Colonial Life. She was promoted to the position of agency development manager after Russ nominated her. Although her job supposedly involved training new agents assigned to her by Russ, she could not recall the.full names of the 10 agents under her. When she testified in July 2013, she also could not explain why her year-to-date income was $20,000 greater than Russ’s.[18]
Brandie admitted that, since November 2011, she has had bank accounts in her name in which Russ regularly deposited large sums of money, including proceeds from the sale of his AFLAC stock. The Bank of America (“BOA”) account was opened in Florida in November 2011, and closed in August 2012. The Chase Bank account was opened in April 2012, after they moved to Ruston. Russ initially testified that he “on occasion” deposited money in Brandie’s BOA account in 2011, but *1025 could not recall if he did in 2012. He also stated that it was “possible” he deposited some in her later Chase account. However, Brandie testified that most of the money in the BOA account belonged to Russ; that she wrote the checks according to his instructions, and that they both used the “check card.” When confronted with the BOA bank records, Russ admitted that he directed |aiAFLAC to deposit funds in Brandie’s account and that he had her write checks on it for his expenses, but denied having a debit card on the account. Evidence was given showing that Russ also made deposits' to Brandie’s Chase account. Additionally, there was evidence of substantial commingling of Russ and Brandie’s funds and expenses to the extent that — taken in conjunction of his lack of credibility — -we cannot say that Russ has submitted any reliable' proof of his actual income.
The reliable evidence marshaled by Jill’s counsel after considerable time and effort, and which was presented at trial, amply shows that Russ had the ability to earn in the range of $175,000 to $200,000 while employed by AFLAC. He chose to quit his lucrative position as a DSC for AFLAC in Florida and return to Ruston to a lower-paying job as a mere agent. Although he now has a management position with a different insurance company, he has continued to funnel money and clients through Brandie in order to lower his reportable income. Despite his denials, we can only conclude — as did the trial court — that Russ has engaged in a deliberate, malicious scheme to reduce his reportable income in order to frustrate his support obligations. We further find no error in the trial court’s holding that Russ was voluntarily underemployed.
Given the evidence presented as to Jill’s need and Russ’s ability to pay, we find that the award of interim spousal support was warranted. In light of his demonstrated earning capability, his voluntary underemployment, and the extensive measures taken by Russ to reduce and conceal his, true income, we are unable to conclude that the trial court ^abused its considerable discretion in setting the amount of interim spousal support at $3,800 per month..
• ■ • Duration
Russ further contends that the trial court erred in extending the interim spousal support award beyond the 180-day period of La. C.C. art. 113 because Jill did not file a motion , or rule for an extension. He also argues that the extension was punitive and not based on “good cause.” Although he never raised this issue below in any pleadings or arguments presented to the trial court, he now seeks to have the interim spousal support terminated as of the date of the divorce in March 2013, or 180 days thereafter.
At the time of the proceedings, La. C.C. art. 113 provided:
Upon motion of a party or when a demand for final spousal support is pending, the court may award, a party an interim spousal support allowance based on the needs of that.party, the ability of the other party to pay, and the standard of living of the parties during the marriage, which award .of interim spousal support allowance shall .terminate upon the rendition of a judgment of divorce. If a claim for final spousal support is pending at the time of the rendition of the judgment of divorce, the interim spousal support award shall thereafter terminate upon renditiomof a judgment awarding or denying final spousal support or one hundred .eighty days from the rendition of judgment of divorce, whichever occurs first. The obligation to pay interim spousal support may extend beyond one hundred eighty days *1026 .from the- rendition of- judgment.-of divorce, but only for good cause shown.[19]
Whether “good cause” exists for the extension of interim support must be determined on a case-by-case basis. Guillory v. Guillory, 2008-1375 (La.App. 3d Cir.4/1/09), 7 So.3d 144. It must constitute, if not a compelling reason, certainly a reason of such significance and gravity that |;>/⅛ would be inequitable to deny an extension of such support.” Roan v. Roan, 38,383 (La.App.2d Cir.4/14/04), 870 So.2d 626. “Good cause” pursuant to La. C.C. art. 113 “requires an affirmative showing by the party seeking an extension of interim support that the extension, is really and genuinely needed, and the purpose for which it is sought is legitimate, not calculated to cause hardship or to obtain as much spousal support as possible for as long as possible.” Roan, supra,
Russ also argues that the extension of interim spousal support by the trial court should be reversed because Jill did not request the extension by filing a rule to extend. In support of this, he-cites Roan, supra, where this court - found the trial court abused its discretion in finding the delay from incomplete discovery was good cause to retroactively extend interim spousal support when no motion to extend had been filed. However, we factually distinguish Roan, which was in a totally different procedural posture. There, a hearing was actually held on the issue of permanent periodic spousal support. The issue was when to end payment for the interim spousal support-and when to begin the permanent periodic spousal support. The payor spouse was paying the interim spousal support ordered by the trial court, and he received a credit for his overpayment. ■ Also, the delays in Roan were attributable to both litigants and no motions to compel or for .contempt were filed to remedy the discovery issues.
'Jill requested both interim spousal support and final periodic spousal support in her original divorce pleading. Review of the record ■ shows that the trial on the support issues was delayed, due to Russ’s failure to supply his financial information, as well as his mistress’s refusal to. answer ^questions during her deposition and supply her financial records, -These matters had to be sorted out through rules to compel and contempt- proceedings before the financial issues could go forward and be litigated. Trial on the objections to the HOC recommendations, including the issue of interim spousal support, and the contempt, motions finally began in July 2018, within 180 days of the March 2013 divorce. After several days of taking evidence, the matter was continued by agreement to September 16, 2013, which was still .within the 180-day post-divorce period. However, to accommodate the knee surgery of Russ’s counsel, the matter was then continued to November 22, 2013, The trial then continued on that date, which was more than 180 days after the divorce became final, without Russ' ever asserting any objection to the lack of a rule to extend. We note that La. C.C. art. 118 itself does not specifically require the filing of an additional pleading to request an extension of the 180-day period.
We further observe that Russ never objected to the continuation of the March 2Ó12 temporary order in the divorce judgment rendered in March 2013, which expressly maintained the temporary order. He never filed any motions to terminate or revoke interim spousal support or to have a hearing set on the issue of entitlement to permanent periodic spousal support, although procedural vehicles were certainly available to him under Louisiana law. See *1027 La. C.C. art. 105, La. C.C.P. art. 2592, and La. R.S. 9:321. ■
We find that the> facts of this'case demonstrate “good 'cause” for ah extension of the interim spousal support. While a.< certain amount of financial gamesmanship and withholding of support is sadly typical in some ^domestic cases, the lengths to which Russ has gone to avoid his financial responsibilities, and to deliberately cause financial hardship for Jill, are outrageous. As a result of his machinations, she is destitute — which was unquestionably his intent — and the continuation of interim spousal support is “really and genuinely needed,” as provided in Roan, supra. The trial court recognized the great severity of the situation and, after careful consideration of all factors, took the only measure it felt would be effective. Based upon, the extreme conduct in this particular case, we find no error on the part of the trial court in its imposition of interim spousal support for a period beyond the 180-day statutory period.
CHILDREN’S HEALTH INSURANCE
In this assignment of error, Russ contends.that the trial court erred in requiring him to maintain major medical insurance coverage with a deducible not to exceed $500 annually on each of his two children with Jill. He claims in his appellate brief that most policies require deductibles from $2,000 to $5,000, and that a policy with a $500 deductible would require a monthly premium of $2,000, .which he cannot afford. -Russ further.asserts.in his rebuttal brief that he had not had the opportunity to respond to the $500 deductible at trial because it was a “new restriction” and not based on the hearing officer’s recommendation.
We note at the outset that there is no evidence in the record supporting Russ’s claims about the premium amounts for the children’s insurance. Furthermore, contrary to. his assertion, the trial court’s decision was based upon the hearing officer recommendation. Review of the HOC report shows that the hearing, officer recommended that the children remain |OTon Medicaid only due to Russ’s unreliability in paying child support and his history of dropping the children’s health insurance coverage. However, the hearing officer further concluded that, should the children be disqualified-from Medicaid, the father was tó provide' private health insurance “with a reasonable deductible not to exceed $500 per year per person.” ■
Like the trial court, we are incredulous that the children of a parent ‘with a demonstrated earning capability as high as Russ’s should be forced to'rely upon Medicaid for health care insurance. Additionally, Russ actually objected to the HOC recommendation that the children remain on Medicaid, insisting that he would provide insurance coverage for them. However, the insurance must have a reasonable deductible, particularly since Jill will be obligated to pay the entire deductible for each child. A deductible of between $2,000 and $5,000 each for these young children would render the coverage ineffective. ■
Based on the record before us, wé find that the trial court did not err in ordering that Russ provide health care insurance with an annual deductible not to exceed $500 per child.
CONCLUSION
The trial court judgment is affirmed. Costs of this appeal' are assessed against the appellant, Richard Russell Hogan.
AFFIRMED.

. He has since retired.

. Eventually, Russ returned a few of the children’s possessions, such as a high chair and a swing. However, they were covered in mold spores. •

. Jill later testified that she learned the children had no insurance when she took their daughter to the pediatrician for her three-month well baby checkup. She followed the doctor’s advice and placed the children on Medicaid.

.Many of Russ and Brandie's travels and other indulgences were extensively documented in their Facebook posts, which were admitted at trial.

. Review of the checks received under these income assignment orders shows that the $2,211 in monthly child support was generally paid from the AFLAC account. Also, since the checks were not issued until the last day of the month owed, they were not received by ■ 'Jill until the following month. Amounts from the CAIC account were significantly less, ' varying from $’204 to $996, and were applied agairfst the child support arrearages.

. Brandie filed two, motions to quash subpoena and subpoena duces tecum and for a protective order in relation to her deposition and, orders to produce her financial records.

. In his trial testimony, he denied that the motion was deliberately timed to try to prevent Jill from receiving 50% of a May 2013 bonus of $10,000 from Colonial Life.

. Review of the checks issued- under this order and admitted at trial show that Jill rarely received an amount even close to the $3,800 per month ordered for interim spousal support.

. The other orders provided that the amount paid was not to exceed 50% of his disposable income, citing the same statute.

. Russ continued to received income from AFLAC due to override renewals on old policies.

. Russ was allowed weekly supervised visitation at The Wellspring, along with his parents and older daughter. Several conditions were imposed, concerning Russ’s substance abuse issues, including attendance at parenting classes; drug testing at Jill’s request; and three substance abuse sessions/meetings per week for a two-year period beginning July 1, 2013, with Jill having access to-these records. Failure to comply with these terms would result in the judgment becoming a Bergeron considered custody decree. Joint counseling as to parenting issues was also ordered. The court directed that there -would be a judicial review of the matter after.July 8, 2014, upon motion of either party.

. Due to a typographical error on a date, a corrected judgment was signed on August 28, 2013.

. The testimony of Russ’s first wife established that she had encountered similar difficulties in obtaining court-ordered child support and health insurance for her daughter from him. She testified that Russ’s older daughter had only had health insurance sporadically, that Russ's child support payments were erratic at best, and that, due to his history of bounced checks, she usually had to cash Russ’s checks at his bank to make sure there were sufficient funds. '

. This evidence was highly relevant under La. R.S.9:326, particularly subsection (B)(3),

. Russ attempted to minimize his many expensive trips by stating, that his employer paid for them. However, Brandie admitted that the cost of the trips was taxable income and that they could turn them down.

. Russ apparently first began deducting chargebacks on his individual tax returns for 2010, which were not completed until August 2012, Russ and Jill filed joint returns only in 2007', 2008 and 2009. According to the testimony, the IRS has given Jill “innocent spouse” status for the 2009 return, At the time of the November 2013 hearing, Russ had failed to pay his income taxes for 2009, 2010 or 2011; the combined amount he owed was about $70,000,.

. The trial court obviously found them less .than credible on many issues, including this one, and the record fully supports that credibility determination. Russ was untruthful, not only in his testimony and on his tax returns, but even had to admit that when he had most recently renewed his insurance license, he falsely-responded "no” to a question about whether he had a child support obli- . gation in arrearage.

.Interestingly, Russ's first wife testified that when she complained to Russ in April 2013 about his failure to pay child support for his older daughter, he insisted that he had no money, but it wasn't a problem because "B is making lots.”

. The statute was subsequently amended, effective August 1..2014,