GARRETT, J.
I! Jessie Rockett appeals from trial court judgments which (1) awarded his wife, Terry Rockett, interim spousal support, and (2) held him in contempt for being $62,231 in arrears on his interim spousal support payments. We affirm both judgments.
FACTS
The parties married in 1976. Five children were born of the marriage. After the youngest child reached the age of majority, Jessie left his wife a handwritten letter on August 11, 2015. In it, he informed her that he was leaving her because he no longer loved her and they had raised their children. Jessie, who was an oilfield drilling consultant making in excess of $400,000 a year, then laid out in detail certain financial matters in his letter. He said he was going to remove his wife’s name from their joint checking account, so he could keep up the truck and car payments.[1] He would keep insurance on his truck and their youngest daughter’s car, as well as keeping hospital insurance on Terry and the daughter. He wanted his motorcycles and guns. He said Terry would get the family home and her car, both of which were paid for, but that she would have to pay her own insurance. He would keep “all the IRA account” because he was giving his wife his monthly retirement check from a former employer. He calculated Terry would get a total of about $7,600 per month, but the amount might be adjusted if the oilfield shut down.
Terry, filed for divorce on August 31, 2015, alleging that Jessie had committed adultery with a woman she named in her petition. Terry | ¿requested both interim and permanent spousal support. She also sought exclusive use of the family home in *1230 Delhi. She submitted an affidavit listing monthly expenses of $8,861. Additionally, she asked for a temporary restraining order (“TRO”) to prevent Jessie from encumbering or disposing of community property, which was granted.
In his answer, Jessie alleged that he and Terry separated on August 11, 2015, due to her chronic gambling habit, which had “virtually pauperized” them and her failure to pay family bills with money he provided. He had no objection to her exclusive use of the family home, so long as reasonable rental was charged for her occupation of his half. He reconvened seeking injunctive relief to prevent Terry from alienating or encumbering community assets. A TRO so ordering was granted.
A hearing officer conference (“HOC”) was held on November 19, 2015. Among the undisputed facts were Jessie’s employment with RWDY, Inc.; his monthly gross income of $26,166; his retirement income of $1,867 per month from former employer Rowan Drilling Company; and his necessary living expenses of $5,744. Terry, who was living in the former marital home, was not employed and had not worked outside the home for many years. Although she listed monthly expenses of more than $8,000, this included $1,500 for food, as well as $1,250 for health insurance which she did not currently have to pay. As a result, it was concluded that her actual necessaiy expenses were no more than $6,000 per month. Jessie claimed that he was unable to pay interim spousal support due to issues with the Internal Revenue Service (“IRS”), which he blamed on Terry’s preparation of their tax returns.
|sThe HOC report recommended that Terry be awarded exclusive use of the marital home, with the issue of rental payments being deferred until trial; that each party receive exclusive use of their respective vehicles and the community movables in their possession; and that each be enjoined from alienating or encumbering community property. On the issue of interim spousal support, the hearing officer recommended that the husband pay $6,000 per month. Additionally, he was to continue to provide her health insurance coverage until a judgment of divorce was entered and to pay her $1,250 thereafter to obtain the same. On November 20, 2015, the trial court made the HOC recommendation its interim order.
Both sides objected to the HOC recommendations. Terry contended that the husband’s monthly income was $28,033, and that she should have been awarded $8,861. Jessie asserted that he feared a tax debt of at least $250,000, which he blamed on his wife and her alleged gambling addiction, and that he had sought advice from a certified public accountant (“CPA”) to avoid criminal prosecution for tax evasion. He stated that he was “taking steps to turn over all income and assets to the Federal Government to ensure that he is not criminally prosecuted.” He maintained that the hearing officer failed to adequately reduce several of the wife’s claimed expenses, which were grossly inflated. Jessie contended that, if all the expenses were reduced to their proper amounts, the wife’s monthly expenses would be only $3,970.
On May 11, 2016, Terry filed a motion for contempt, alleging that Jessie was in arrears in the amount of $51,100 for interim spousal support and $7,500 for comparable health insurance coverage. A hearing was set for May 20, 2016. On May 18,2016, Jessie filed an exception of lack of service |4and/or untimely service of the contempt motion, as well as a motion and rule for reduction of spousal support.
On May 20, 2016, a hearing was held on *1231 the interim spousal support issues,[2] Testimony was given by the parties; one of their sons; the wife’s sister and niece; and Lawrence W. Pickett, the husband’s CPA. The evidence revealed that Jessie had removed Terry’s access to most of the money that had been in their joint account and that he had made only small, sporadic payments to his wife since the separation. The testimony of the wife and relatives established the wife’s poor health (diabetes, hypertension, anxiety, and depression), which required daily medication, and her impecunious circumstances. She also had experienced serious issues with her knee that required surgeries and caused her to be in a wheelchair for four years. At the time of trial, she still used a cane and was unable to stand without assistance. She required help to clean the house and Jessie had paid Terry’s sister to do their housekeeping. Due to a lack of funds, Terry was unable to pay for such things as her medications, groceries, lawn maintenance, or the gas bill. After the gas was turned off, she had no hot water for washing dishes or bathing and had to go to her son’s house to shower. Also, she no longer had a bank account.
Both sides submitted affidavits of expenses. Terry’s affidavit showed expenses of $8,861.00, while Jessie’s were $6,744.30. As to the amounts on her affidavit of expenses, some of which were excessive, Terry stated that she listed the sums she was accustomed to spending and did not understand that she was supposed to figure out solely her own expenses. She explained Ifithat she never had to budget during the last years of the marriage because their income was so high. She also testified that . the family home in which she was residing was in poor condition. She had applied for food stamps and disability, but her requests were denied based on Jessie’s level of income. Jessie testified that he and his girlfriend were living together in a house that cost $1,300 per month in rent and that he had paid a year’s rent in advance. The girlfriend was not employed.
Jessie testified that in 2015 he made $410,000, or about $30,000 per month. However, he claimed that he was terminated on January 26, 2016, due to a workforce reduction and that he had been unsuccessful in securing any job in any field since then.[3] Jessie also testified that his wife was in charge of doing their taxes and that he believed that she had been taking them to Pickett. Pickett testified that Jessie had consulted him about the couple’s tax situation. According to his estimates, they owed a total of between $350,000 and $400,000 in tax liability for 2011 to 2015. Pursuant to Pickett’s advice, in late 2015 and early 2016, Jessie made large payments totaling $60,000 toward the 2015 tax debt. Terry testified that she had always prepared and signed their tax returns. She acknowledged that in 2010, when Jessie asked her to take the taxes to Pickett, she lied that she had done so, but she continued to do them herself, utilizing a tax preparation software on her computer. When she learned in 2014 that she had underpaid the 2011 taxes, she arranged to make installment payments and was still in the process of catching up the payments when her husband left her. Terry introduced into, evidence a document dated March 7, 2016, which she had | (¡recently received from the IRS indicating the parties were entitled to a refund of more than $2,100 from a prior tax year.
*1232 Jessie claimed his wife went to the boats and gambled a lot. However, he admitted that they went to the casinos together. Furthermore, he was confronted with documentation showing sums of money he had won gambling. Terry and her sister testified that they went to the casino together infrequently while Jessie was away. Both spouses stated that they had not been gambling since the separation.
At the conclusion of the hearing, the trial court requested that the proceedings be transcribed to facilitate its review of the testimony and the various exhibits.
On August 29, 2016, the trial court issued lengthy written reasons for judgment.[4] Beneficially for purposes of our review, the opinion contained important credibility determinations and citations to specific portions of the record and exhibits relied upon by the lower court in drawing its conclusions. Notably, the court found Terry .to be a credible witness and described Jessie’s testimony as “self-serving.” It found that Terry was “in dire need of interim spousal support.” In particular, the court noted her poor health and disability. The court also cited her testimony about the “very comfortable” lifestyle she enjoyed before the separation. The court found that Terry’s reasonable expenses totaled $5,687.[5] However, effective April 1, 2016, it reduced the amount to $5,387, to reflect a reduction in her |7health insurance expense. As to Jessie’s ability to pay, the court observed that there was limited documentation as to his income. However, by his own admission, he made $143,500 from the time of the' separation until he was laid off. Additionally, bank records showed deposits from his, employer, RWDY, and monthly pension check from a former employer. Taking this data into account, the court found that Jessie had access to $216,269.87 net income from August 2015 to August 2016. The court also considered', other assets at Jessie’s disposal, including his two motorcycles, a rent house in Delhi, and, an IRA in his name worth more than $111,000. (Terry apparently had an IRA worth less than $2,000.) The court concluded that Jessie was voluntarily unemployed and capable of earning a monthly income in an amount sufficient to meet Terry’s needs.
While'finding that the couple had a significant tax problem, the court' held that this did not excuse Jessie’s failure to pay court-ordered spousal support. It concluded that Terry lacked the expertise to handle taxes for Jessie’s large salary. It also determinéd that she did not intentionally try to defraud the government and noted that both spouses had a responsibility to make sure their tax obligations were paid.
The court ordered Jessie to pay Terry $5,687 per month, retroactive to the date of judicial demand through March 31, 2016; thereafter, it reduced the amount to $5,387 per month. It deferred computation of. the credit owed to Jessie .for support already paid. Judgment was signed and filed September 15, 2016; it cast Jessie with all costs.
fjjOn September 15, 2016, the contempt hearing was held.[6] The parties stipulated *1233 that Jessie paid Terry a total of only $9,900 between November 2015 and April 2016. From August 31, 2015, to September 1, 2016, Jessie owed her a total of $72,131; subtracting the amount paid, the arrearag-es were determined to be $62,231. After healing testimony from the parties, the court found Jessie in.contempt and sentenced him to 30 days in jail. The sentence was suspended upon his payment of $20,000 within 30 days of the court’s order. Jessie was further ordered to pay $500 per month toward the arrearages, effective October 1, 2016, until he became employed. Judgment was signed and filed September 27,2016.
Jessie appealed from both the September 15, 2016 judgment .and the September 27, 2016 judgment. The trial court ordered that the two judgments be consolidated for purposes of judicial efficiency and appeal.
INTERIM SPOUSAL SUPPORT

Law

In a proceeding for divorce, the court may award an interim periodic support allowance to a spouse based on the needs of that spouse, the ability of the other spouse to pay, and the standard of living of the spouses during the marriage. La. C.C. arts. 111 and 113; Hogan v. Hogan, 49,979 (La, App. 2 Cir. 9/30/15), 178 So.3d 1013, writ denied, 2015-2018 (La. 1/8/16), 182 So.3d 953; Evans v. Evans, 49,160 (La. App. 2 Cir. 6/25/14), 145 So.3d 1093.
|sThe purpose of interim spousal support is to maintain the status quo without unnecessary economic dislocation until a final determination of support can be made and until a period of time of adjustment elapses that does not exceed, as a general rule, 180 days after the judgment of divorce. Hogan, supra; Brown v. Brown, 44,989 (La. App. 2 Cir. 1/27/10), 31 So.3d 532. A spouse’s right to claim interim periodic support is grounded in the statutorily imposed duty on spouses to support each other during marriage and thus provides for the spouse who does not have sufficient income for his or her maintenance during the period of separation. Evans, supra; Broum, supra. The needs of the claimant spouse have been defined as the total amount sufficient to maintain her in a standard of living comparable to that enjoyed by her prior to the separation, limited only "by the payor spouse’s ability to pay. Hogan, supra.
In order to demonstrate need for interim periodic spousal support, the claimant spouse has the burden of proving that he or she lacks sufficient income, or the ability to earn a sufficient income, to maintain the standard of living that he or she enjoyed during the marriage. Evans, supra; Brown, supra. Awarding support also requires finding that expenses were reasonable. Derouen v. Derouen, 2004-1137 (La. App. 3 Cir. 2/2/05), 893 So.2d 981. Once the claimant spouse has established need, the court must examine the ability of the payor spouse to provide support. Evans, supra; Brown, supra.
In assessing a spouse’s ability to pay, the court must consider his or her means. “Means” includes any resource from which the wants of life may be supplied, requiring an assessment of the entire financial condition of the payor spouse. Brown, supra. “Entire'financial condition” is not limited | into income, but also includes any resource from which his or her needs can be supplied, including income from labor or services performed, physical property, income from, such property, and a spouse’s earning capacity. Brown, supra; *1234 Loftice v. Loftice, 2007-1741 (La. App. 1 Cir. 3/26/08), 985 So.2d 204.
If the needs of the claimant spouse surpass the ability of the other spouse to pay, interim spousal support should be fixed at a sum which will, as nearly as possible, be just and fair to all parties involved. Brown, supra; Lambert v. Lambert, 2006-2399 (La. App. 1 Cir. 3/23/07), 960 So.2d 921.
The trial court is vested with much discretion in determining an award of interim spousal support. Such a determination will not be disturbed absent a clear abuse of discretion. Hogan, supra; Brown, supra. An abuse of discretion will not be found if the record supports the trial court’s conclusions about the needs of the claimant spouse or the means of the payor spouse and his or her ability to pay. Hogan, supra; Evans, supra.
Domestic relations issues, such as the determination of entitlement to spousal support, largely turn on evaluations of witness credibility. King v. King, 48,881 (La. App. 2 Cir. 2/26/14), 136 So.3d 941; Jones v. Jones, 38,790 (La. App. 2 Cir. 6/25/04), 877 So.2d 1061. Voluntary unemployment is a question of good faith on the part of the obligor spouse. Bagwell v. Bagwell, 35,728 (La. App. 2 Cir. 3/8/02), 812 So.2d 854.
The fact finder has the discretion to accept or reject, in whole or in part, the testimony of any witness. King, supra. Reasonable evaluations of credibility should not be disturbed on appeal. Rosell v. ESCO, 549 So.2d 840 (La. 1989).
| Discussion
Terry demonstrated that she was in desperate need of interim spousal support. During the marriage, she enjoyed a “very comfortable” lifestyle wherein she never wanted for anything or had to budget.[7] After her husband left, taking the vast majority of their bank account funds with him, she was swiftly reduced to impecunious circumstances. Her situation was so dire that she could not even afford to pay the gas bill for the family home where she was living, which resulted in the gas being cut off. She was without hot water for purposes of cleaning and bathing and her gas stove was useless. She was forced to rely on a microwave to cook food, as well as heat water for washing dishes. She had to go to her son’s house ten miles away to shower. Additionally, she had to depend upon the generosity of relatives, such as her sister, niece, and son, to pay for her groceries, utilities, and her many medications for a host of medical conditions.
The record further showed that Jessie had the ability to support Terry. As astutely observed by the trial court in its excellent and well-reasoned written reasons, the record is notably devoid of much in the way of financial documentation. However, Jessie’s own testimony established that he earned more than $140,000 from the time of the separation until he was laid off. The few bank records admitted into evidence further support the trial court’s calculations about the significant sums to which Jessie had access. He also had other assets at his disposal (which included two motorcycles and an IRA worth more than $111,000). Furthermore, he had ample funds in August |122015 to pay in advance a year’s rent of $1,300 per month on a house for himself and his girlfriend.[8]
*1235 The trial court was unimpressed by Jessie’s self-serving claim that he was completely unable to secure any employment whatsoever. The court took particular notice of Jessie’s “enviable work history” and his candid admission that the length of a layoff “just depends how bad you want to go back to work.” The court further observed that the return-to-work date of late 2017 given by Jessie in his testimony was advantageous to him for purposes of both the interim and permanent spousal support litigation. Given the trial court’s superior position to judge credibility, we are unable to find that it was manifestly erroneous in concluding that Jessie was voluntarily unemployed.
As to the issue of the substantial IRS debt allegedly owed by the couple, relatively little evidence was presented beyond tlie self-serving testimony of Jessie and his CPA. No documentation from the IRS was supplied to verify their assertions on the matter. Based upon the sparse record currently before us, we cannot find that the trial court abused its discretion in refusing to accept Jessie’s contention that his large, arbitrary payments to the IRS, which he unilaterally chose to make, discharged or reduced his obligation to pay the court-ordered interim spousal support to his wife.
In setting the amount of the interim spousal support, the trial court recognized that some of Terry’s expenses were overestimated. Taking that |1sinto consideration, it adjusted those expenses down to reasonable amounts. We find no abuse in the trial court’s discretion in setting these expenses as so modified.
Furthermore, the record does not support Jessie’s claims that Terry was an out-of-control gambler who “virtually pauperized” them. The evidence presented at trial on this issue indicated that gambling at casinos was a recreation in which both spouses indulged, usually together, during the marriage. Indeed, evidence of Jessie’s gambling winnings was introduced by Terry.
Based on the above, we find that the record amply supports the trial court’s findings that Terry was in dire need of interim spousal support and that Jessie had the ability to pay her reasonable expenses. Accordingly, we find no abuse of the trial court’s discretion in its award of spousal support in favor of Terry.
CONTEMPT

Law

Pursuant to La. R.S. 13:4611(l)(d)(i), the courts may punish a person adjudged guilty of a contempt of court, including disobeying an order for the payment of spousal support, by a fine of not more than $500, or imprisonment for not more than three months, or both.
Willful disobedience of any lawful judgment, order, mandate, writ, or process of the court constitutes a constructive contempt of court. La. C.C.P. art. 224(2). To find a person guilty of constructive contempt, it is necessary to find the con-temnor violated the order of court intentionally, knowingly, and purposely, without justifiable excuse. Kairdolf v. Kairdolf, 46,035 (La. App. 2 Cir. 3/2/11), 58 So.3d 527; Howard v. Oden, 44,191 (La. App. 2 Cir. 2/25/09), 5 So.3d 989, writ denied, 2009-0965 (La. 6/26/09), 11 So.3d 496.
Although, as a general rule, failure to pay support resulting from the ob- *1236 ligor’s financial inability to pay cannot support a contempt charge, this issue, is primarily factual, and a trial judge’s finding thereon should not be disturbed absent a finding of manifest error. Fontana v. Fontana, 426 So.2d 351 (La. App. 2 Cir. 1983), writ denied, 433 So.2d 150 (La. 1983).
A proceeding for contempt in refusing to obey the court’s orders is not designed for the benefit of the litigant, though infliction of a punishment may inure to the benefit of the mover in the rule. The object of the proceeding is to vindicate the dignity of the court. Howard v. Oden, supra; State ex rel. J.M. v. Brooks, 42,846 (La. App. 2 Cir. 12/5/07), 972 So.2d 1197.
The trial court is vested with great discretion in determining whether a party should be held in contempt for disobeying the court’s order, and its decision will only be reversed when the appellate court can discern an abuse of that discretion. Fradella v. Rowell, 49,350 (La. App. 2 Cir. 8/13/14), 147 So.3d 817; Mizell v. Mizell, 37,004 (La. App. 2 Cir. 3/7/03), 839 So.2d 1222.

Discussion

Jessie again contends that his state of unemployment and the tax debt justified his failure to pay the court-ordered interim spousal support. As a result, he claimed that the trial court abused its discretion in holding him in contempt. He asserts that his contempt should be absolved by his payments of $60,000 toward the tax debt and $9,900 to Terry during the same time period.
ItrAt the conclusion of the contempt hearing, the trial court assigned oral reasons for- holding Jessie in contempt for his willful failure to pay interim spousal support, It noted that the evidence established Jessie had access to a large amount of money and that, even before he was laid off in January 2016, he had chosen not to pay his wife the support ordered by the court. The court specifically noted that, at no time, had Jessie ever tendered to his wife the full amount ordered by the court and that he had assets, such as- his pern sion, motorcycles, and his IRA account, at his disposal. As to the tax debt issue, which was a community debt, the court opined that it would have to be dealt with during the community property partition. Given the good faith of both spouses, the trial court believed that it was unlikely that the IRS would jail them; The trial court also stated that it had faith that, given Jessie’s employment record and experience, he would soon obtain employment.
While the possibility of a substantial tax liability may loom on the horizon, that matter was not fully litigated during the proceedings currently under review by this court. Like the trial court, we-believe that this issue is more properly addressed in subsequent litigation. Consequently, we are unable' to say that the trial court abused its discretion in holding that the tax matter did not justify Jessie’s refusal to pay the interim spousal support; The record demonstrated that Jessie had ample resources to pay the interim spousal support and simply chose not to do so as a punitive measure against Terry. Accordingly, we affirm the trial court judgment holding Jessie in contempt.
^CONCLUSION
The trial court judgments are affirmed. Costs of this appeal are assessed to the appellant, Jessie Rockett.
AFFIRMED.

. The record indicates that Jessie closed the account on or about August 18, 2015, taking about $19,000 for himself and leaving Terry with only $3,500.

. The contempt hearing was heard at a later date.

. However, at the contempt hearing, he admitted telling his daughter that he lost his job when he and a driller were "run off" due to a mistake by the driller.

.In the meantime, pursuant to Jessie's March 2016 motion and rule for divorce, a judgment of absolute divorce was rendered on July 11, 2016. The judgment terminated the community retroactive to August 31, 2015, while maintaining the injunctions and the November 20, 2015 interim order.

. In reaching this amount, the court reduced (food, clothing, grooming, cell phone) or removed (car note) certain expenses on Terry’s affidavit

. In September 2016, Terry filed for partition of the community property, and Jessie filed a motion and rule to find Terry guilty of fault to preclude eligibility for permanent periodic *1233 spousal support, These matters are not before us in the instant appeal.

. Jessie admitted that the $7,600 monthly support he proposed for his wife in his August 2015 letter was representative of their standard of living at the time.

. The court specifically found that it was "un *1235 conscionable” that Jessie was living with his girlfriend in a rental house paid for a year in advance and making motorcycle payments when Terry could not even afford groceries or medication.