DREW, J.
hWe review and affirm here a trial court’s initial considered judgment granting sole custody of young children to their father and requiring supervised visitation when the mother has the children with her.

FACTS

Taylor Wilbanks and Jessica Wilbanks married on October 3, 2009, when they were very young. Soon after marriage, Taylor joined the army and the young couple was shipped to Alaska, along with an infant child. A second child was born in Alaska, where the couple lived unhappily for more than three years.[1]
Taylor suffered a hearing loss in the service and was honorably discharged. The young family moved back to northeast Louisiana on November 21, 2012, into a trailer belonging to his parents. Three weeks later, he walked out of the marriage, leaving Jessica and the children in the trailer.
Custody was litigated on January 31, 2014. Upon close of evidence, the trial court found Jessica to be immature, unstable, and totally lacking in credibility, as she lied several times in court. In particular, the trial court found that she lied about staying overnight with men at times when she had the children.
The judgment of divorce was signed immediately. The custody judgment was not signed until May 28, 2014, four months after trial.
*434 Jessica appeals, contending that the trial court erred: (1) by failing to ¡¡¡follow the guidelines[2] in deciding custody, (2) by awarding sole custody to the father, and (3) by ordering supervised visitation with no evidence of abuse or neglect on her part. There are no other extant issues.

TESTIMONY

Jessica Wilbanks testified that the initial recommendation of the hearing officer was that she be the custodial parent, with Taylor to have monthly visitation the first three weekends of each month and two weeks in the summer.[3] Taylor was to pay monthly $486 in child support and $300 in spousal support.
At the time of trial, he was behind on his spousal payments.
After Taylor left the mobile home, his parents allowed Jessica and the | ¡¡children to stay in the trailer for about six months, during which period of time:
• the in-laws continued to pay the trailer’s utility bills; and
• Jessica changed the locks on the trailer without permission.
In April of 2013, on a weekend when Taylor had the children, and when Jessica wasn’t home, her in-laws had the locks changed, putting Jessica and the children on the street. This strategic action was apparently closely coordinated with Taylor’s filing for an emergency change of custody, which was partially predicated upon Jessica’s lack of a suitable home for the children.
Jessica was unemployed, with either zero or unreliable transportation,[4] which adversely affected her trade school training to be a dental assistant.
During the year immediately after eviction from her in-laws’ trailer, she lived in four different locations, sometimes with her relatives. She later moved to a duplex in Start.
*435 Jessica alleged and Taylor denied that he always knew where she was, always had her phone number, and agreed with the school,registration decision.
Jessica listed many of her relatives[5] who had helped care for the children and stated Taylor had at times taken the children to her ¡4grandmother to care for them. During the trial, her grandmother had the younger child. Jessica asked the court to keep the present custody arrangement in place.
At trial, Jessica was 23 years of age. She testified that:
• she mainly stayed with her parents and sister in the previous months;
• she never spent the night with Billy Hays with the children present;
• she often needed Taylor’s help in keeping the children;
• she had dated Billy Hays for three or four months;
• she had taken Adderall for attention deficit disorder since she was 18;
• Taylor was a good father;
• she had always been the main parent to care for the children;
• she had at times cursed in front of the children; and
• she had never abandoned the children.
Ouachita Parish Sheriff’s Deputy Zachary Johnson testified that he was dispatched to answer a complaint on July 13, 2013. The complainant was Jessica’s boyfriend, who had apparently thrown some of his things together, left their home, and was walking away on White’s Ferry Road[6] in Ouachita Parish. Strangely, Jessica and the children were following him, also on foot.
The deputy located Jessica and the children about a half mile from her house. She said she was following her boyfriend to find out why he left her.[7]
| sBefore the trial, the deputy never saw or knew the name[8] of the male complainant.
The deputy offered to put the children in his car due to the heat, but Jessica called Taylor, who came to get the children. Jessica’s mother came to pick her up. The deputy accompanied the family back to the residence. He saw no evidence of neglect, abuse, or illegal activity, but he did not go inside the premises.
Jessica denied the deputy’s testimony and the police report. Her story was that she was walking with her children to buy diapers.
Debra Black Wilbanks, Taylor’s stepmother, testified that: •
• she had been married to Taylor’s father for 15 years;
• Taylor took very good care of the children and met their needs;
• Jessica stayed in the trailer for about six months after the breakup;
• Jessica kept the trailer very messy and did not pay the utility bills;
• Taylor attended church and took the children when he had them;
• Taylor now works in maintenance at one of the family nursing homes, but cannot work a 40-hour week due to his -responsibilities to the children;
*436 • his having to pick up the children on short notice cost him a previous job;
• Jessica had sent her obscenity-laced texts;
• she had heard Jessica use foul language in the presence of the children;
• she had concerns about the stability of Jessica’s care of the children;
k* Jessica ignored one child’s speech problems and the other’s ringworm;
• one of the children routinely came back sick from Jessica’s care;
• Jessica did not keep the children clean and did not feed them properly;
• Jessica had been away for days at the time they had the locks changed;
• Jessica had previously changed the locks without their permission;
• during Taylor’s visitation time, he either stayed at the trailer or with them;
• Jessica had unreasonably denied Taylor visitation several times; and
• she never knew that the hearing officer had recommended that Jessica and the children stay in the trailer, and that Taylor should pay the trailer bills.
Billy Hays testified that:
• he was 27 years of age and worked as a roofer in West Monroe;
• he had dated Jessica for three or four months;
• he had never stayed overnight at Jessica’s home;
• she stayed with him about half of the time, during which her children had stayed overnight at his home a total of 14 to 17 days;[9]
• Jessica misled him to believe she was legally divorced; and
• Jessica told him that she and Shawn Knight had no sexual relationship.
Raymond Patterson, Jessica’s father, testified that:
• his daughter stayed in his home very little after she and Taylor separated;
• contrary to his daughter’s testimony, she had not stayed at his house for the three or four months prior to the trial;
h* she had lived with Billy Hays and also stayed with her grandmother;
• on more than a dozen times in the last six months, at times when he kept the children, Jessica would not respond when he asked her whereabouts;
• he had twice threatened to turn Jessica in for child abandonment;
• the children would be better off with Taylor having custody; and
• he and his wife would be willing to supervise Jessica’s visitation if ordered.
Taylor Kyle Wilbanks, age 25 at trial, testified that:
• he studied welding at Vo-Tech and learned plumbing in the Army;
• he was stationed in Alaska, then was honorably discharged;
• the needs of his children caused him to lose his job with All Plumbing;
• Jessica frequently called him to pick up the children with no notice, which led his employer at All Plumbing to conclude that he was undependable;
• he planned to live close to his family in Delhi;
• he had made full arrangements for his children if he got primary custody;
• his job kept him from getting the children three weekends per month;
• when he had the children, they went to Delhi to be with his parents;
• Jessica was generally a good mother to their children; and
*437 • while in Alaska, she was a stay-at-home mom.

GENERAL ANALYSIS

The best interest of the children is the guiding principle in all custody litigation. La. C.C. art. 131; Howard v. Oden, 44,191 (La.App.2d Cir.2/25/09), 5 So.3d 989, writs denied. These difficult decisions are always 18fact-intensive. Appellate courts must give great weight to a trial court’s determination of custody and visitation, and these decisions will not be overturned absent a clear abuse of discretion. Leeper v. Leeper, 44,777 (La.App.2d Cir.9/23/09), 21 So.3d 1006.

ANALYSIS OF THIS CASE

We have scoured this record and can find only three facts in Jessica’s favor:
(1) Taylor and she each said the other was a good parent.
(2) Jessica did by far the lion’s share of parenting in Alaska.
(3) The hearing officer recommended that the children be with her.
Other than Jessica’s self-supporting testimony, every sentence spoken by every witness supported the trial court’s decision to establish sole custody in favor of Taylor. There is a mountain of evidence that supports the trial court’s decision.
Jessica clearly lied on multiple occasions at trial. She exhibited poor judgment in walking her babies down the shoulder of a busy four-lane highway, as she pursued her former live-in boyfriend to find out why he was leaving her.
Jessica spoke of the support group available from her side of the family, yet none of these was called to testify at the custody hearing. Her own father sadly recommended that the children be placed with Taylor. He also agreed to provide supervised visitation, if ordered to do so by the court.
This record paints a picture of a selfish young woman who married too young, is immature, and makes terrible decisions. She places her needs |flbefore her children. She doesn’t understand what taking an oath means.
The trial court got this right. It would have been better had the court gone through the guidelines of LSA-C.C. art. 134. However, there was really nothing to balance — the evidence clearly and overwhelmingly favored the father. Short of an abuse situation, it is hard to conjure up facts more supportive of sole custody.
For now, these children will be better served by placement with the father, and with supervised visitation in the presence of one or both of her parents. We commend Jessica for furthering her education. We acknowledge her poverty, along with her immaturity. She is not a bad person, but she has been making terribly selfish decisions. We look forward to her progress into adulthood.

DECREE

The judgment of the trial court is affirmed. Costs are to be paid by the appellant to the extent allowed by La. C.C. art. 5188.
AFFIRMED.

. The marriage produced a total of two children, ages four and two at time of trial.

.LSA-C.C. art. 134. Factors in determining . child's best interest
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.

. Taylor asked for the children every other weekend because he was on call with his job. Jessica acknowledged refusing to let him have the children "once or twice.”

. Taylor took the family's truck when he left. This left Jessica without transportation. Jessica testified that her father-in-law bought her a car, but it was not reliable.

. Her only relative to testify was her father. He urged that Taylor should have custody.

. The road had four lanes and a shoulder.

. This was not the explanation that Jessica gave at trial.

.At the request of the trial court, the deputy further investigated on the date of the trial and reported to the court that the complainant’s cell phone number was in the name of Shawn Knight. Jessica denied under oath that she had ever dated Knight.

. When asked by the court to explain her earlier testimony that she and her children had never stayed overnight with Billy, Jessica said she misunderstood the question.