DREW, J.
|iJerushka Ellis' appeals a judgment awarding primary domiciliary custody of her son, Leo Ellis, III, to her former husband, Leo Ellis, Jr. We find no abuse of discretion and so affirm the judgment of the trial court.
FACTS
Leo Ellis, Jr. (“Leo”), and Jerushka Ellis married in April 2006. They had one child, Leo Ellis, III (“L.J.”), who was born on February 13, 2008. The parties separated and reconciled in 2010, but in January 2012, they, separated again. In February 2012, Jerushka filed a petition for divorce and. a. petition for protection from abuse, the .latter alleging that Leo had grabbed her arm, slammed her into a wall, and attempted to strangle her.[1]
On March 7, 2012, the trial court issued an interim custody order awarding the parties joint custody of L.J. and designating Jerushka the domiciliary parent. ' Leo had custody of L.J. every Tuesday and Wednesday and every other weekend. The court also ordered the parties to attend parenting classes and ordered Leo to complete an anger management class.
In January 2013, Jerushka filed á rule to modify custody, alleging that the parties had been unable to communicate and co-parent, that Leo was “overcome with anger and resentment” and had become physical with her, and -that L.J.’s drowsiness at school proved that the midweek visitation with Leo was not in the child’s best interest.'
On March 25, 2013, Leo filed á motion to appoint a mental health professional under La. R.S. 9:331 to evaluate the parties and assist the trial court in making the custody determination. Leo asserted that the court |2should make this appointment be *754 cause of Jerushka’s allegations of Leo’s misconduct, as outlined in her rule to modify custody and petition for divorce. .He also asserted that an evaluation was warranted because Jerushka “has a. diagnosis and history of treatment for both depression and anxiety” and that she was not compliant with her doctor’s treatment plan.
The trial court heard the motion for appointment of a mental health professional on May 7, 2013. After receiving into evidence certain records from this expert, the court 'made its ruling on the motion:
We have discussed this- at length during the pretrial conference. I listened to the arguments of both counsel concerning the appointment of a mental health professional.... Ms. Ellis objected to the appointment of the mental health professional. However, based on the allegations in this matter, and specifically two main .allegations, one, that there is allegedly a history of physical abuse which has taken place, and also there are allegations that the parties just don’t get along very well at all, and I understand that’s an understatement from our pretrial conference. And that that is causing issues with regard to their co-parenting of their five-year-old son.
So for those reasons, the Court does find sufficient grounds to appoint a mental health professional. I’m going to appoint Dr. Julia Wood, Ph. D., to do the evaluations. This is Mr. Ellis’ motion and request, and Ms, Ellis is objecting to that, and so I’m going to. appoint Dr. Wood, but with the fees to be paid by Mr. Ellis in full. He does reserve his right, however, to have them reapportioned later in the matter..
And I will tell both parties that — and I understand your concerns, and Ms. Ellis I understand your concerns for objecting to that, but this really is a pretty routine issue in family court. It doesn’t mean that there is anything wrong with either one of you. This is just something that the Court needs in assessing both parties to determine the best interest of the child. So I certainly understand your concern, given the field that you’re in, but simply because the Court is appointing a mental health evaluator doesn’t mean that the Court finds that there is anything wrong with either one of you. I just need the information that Dr. Wood can gather and report back to me.
laThe trial court signed an order on May 16,- 2013, appointing Dr. Wood as the court’s mental health expert and ordering the parties to make themselves available for evaluation.
On June 21, 2013, before Dr.- Wood had the chance to interview the parties, Leo filed a rule to modify custody, arguing that it was in L.J.’s best interest that Leo be awarded sole custody of the child.
Dr, Wood evaluated the parties and made a report. In October 2013, the parties filed a joint motion to have Dr, Wood’s report released to therapists for Leo, Jer-ushka, and L.J, That motion stated that Dr. Wood had recommended therapy for Jerushka and Leo and that Dr. Wood had recommended that L.J. be evaluated by a child psychologist;, the court granted the parties’ motion.
After an effort at mediation failed, Leo filed an amended rule to modify custody. Leo-again asked the court to award him sole custody of-L.J, because:
• Dr. Wood’s evaluation had been completed and her report filed, and
• “The parties’ son has been removed from another daycare facility because of the way [Jerushka] has treated the director and other employees, in the child’s presence, which makes the sec *755 ond time in the last twelve months that the child has been removed from a daycare facility due to. the behavior of [Jerushka].”
Jerushka answered this rule and asserted that there was, no basis to change her time with the child from 15 nights a month to the four that Leo requested.
The rule to modify custody' was tried over four days in January and | .¿February 2015, and the court heard testimony from over two dozen witnesses. At the time of trial, L.J. was six years old.
Leo testified that:
• he has had á full time job for about 10 years and lives in a gated community close to L.J.’s school;
• he pled no contest to domestic abuse battery because of one incident with Jerushka, and ultimately that conviction was set aside and the prosecution dismissed;
• he had completed anger management and parenting classes;
• he was unaware of Jerushka’s current 1 relationship status;
• he would like custody of L.J. on all school days to make sure that L.J., who has ADHD, stayed focused and because he and Jerushka “can’t work together”;
• he administers L.J. the prescribed medicine for ADHD'but L.J. tells Leo that Jerushka does' not dó so; and
• L.J. had been asked to leave “at least” five daycare facilities, largely because Jerushka could not get along with the daycare workers.
Jerushka testified that:
• she is presently L.J.’s domiciliary' parent, and believed that this was in L.J.’s best interest;
• she lives in a two-story house near L.J.’s school, where L.J. has his own bedroom and a yard to play in;
• she has an advanced degree and is currently employed in a field related to that degree;
• she is presently engaged to be married;
• Leo had been physically violent with her in 2012 and that this incident led to her seeking a divorce; >
• L.J. left various daycare facilities for financial, behavioral and toilet issues, and she always offered support to the . daycare workers;
h* she was reluctant to start L.J. on ADHD medicine without first exploring other options to treat his condi- ■ tion;
• she had arranged for tutoring for L.J. to improve his school performance;
• L.J. had been tardy to school while in Leo’s care; and
• she and L.J. participate in many activities together and she spends time working with and caring for L.J.
Dr. Julia Wood testified that:
• she evaluated both Leo and Jerushka Ellis and her initial evaluation led her to believe that they should have “no face-to-face contact”;
• Leo has undergone anger management and counseling and that her opinion was, “I don’t believe that he really has an anger problem. I believe that he has an interaction with ... a specific person problem”;
• Leo’s version of the physical altercation was that it was a “mutual altercation,” whereas Jerushka said that it was not; :
• Leo was cooperative with her evaluation, he scored high on the “mania” scale indicating that he had “a lot of energy,” and scored high on the obsessive-compulsive scale but did not have a disorder or any psychopathology;
*756 • L.J. reported that his mother told him that “his grandmother- [who is deceased] is still here in other people”;
• L.J. exhibited overactivity but Leo had no trouble “reining him in”;
• Jerushka was “very defensive, very resistant, almost hostile in her presentation with me” and “her first interaction with me was quite resistant and defiant”; [2]
• her interview with L.J.’s daycare workers about the parents’ behavior showed that Jerushka behaved consistently with Jerushka’s statements that, “no one can control me, I do what I want”;
h* LJ.’s witnessing. Jerushka’s negative interactions with the daycare workers was “very harmful” to L.J. and set a “dangerous example” for the child regarding his ability to listen to authority;
• Jerushka refused to speak to her about her fiance, saying, “that is none of your business, he’s my personal business”;
• Jerushka had narcissistic personality disorder and was hypermanic;
• Jerushka’s traits contributed to the frequent transfer of L.J. from daycare to daycare and to her resistance to seek appropriate treatment for LJ.’s ADHD;
• Jerushka was not as successful as Leo in getting L.J. to behave;
• Jerushka had not been compliant with . therapy;
• Jerushka had the potential to be a great mom and could make her condition not problematic with the right therapy and willingness to change; and
• Leo, not Jerushka, should be the domiciliary parent because Jerushka has refused to improve her condition through therapy, and “once she gets therapy, this is going to work itself out.”
From the numerous other witnesses, various facts emerged, including:
• one of the daycare workers who looked after L.J. said that when Leo brought the boy in, he made L.J. walk in and L.J. had on pressed clothes, but when Jerushka brought him in, she would carry him and he would sleep;
• other daycare workers described L.J.’s behavioral problems and how L.J. responded to discipline from his father but not his mother, and one reported that she wanted to “beat up” Jerushka “because of the way she was talking to me”;
• child psychologist Susan Vigen diagnosed L.J. with ADHD;
• Leo’s parents testified about their close relationship with L.J. and about Leo’s parenting ability;
• a counselor who worked with Jerushka said that she attended six sessions and cancelled six others; the counselor reported only “a little bit of forward movement”;
[• the police officer who responded to the 2012 domestic violence incident described the scene and noted that Jerushka had “scratches and marks on her back” and that “there was a mark on the wall where I could tell that somebody had pushed into the wall”;
• the pastor at the parties’ church testified that he provided them marriage counseling; he described Jerushka as the more assertive member of the couple;
*757 • one of Jerushka’s longtime friends described Leo as “controlling” and said that Jerushka appeared to be a loving mother and a good parent, and several of her other friends said that L.J. seems to respond well to discipline from Jerushka; and
• another of Jerushka’s friends testified about bruises she saw on Jerushka after the January 2012 incident.
The trial court gave extensive oral reasons for judgment, including:
• Dr. Wood considered Leo the more proactive parent regarding treatment of L.J., and said that Jerushka was resistant to “the process in general”;
• the daycare workers all said that L.J. needed behavioral help;
• the daycare workers got along with Leo but not Jerushka, and the frequent moving of the child was detrimental to L.J.;
• L.J. had ADHD that needed treatment and further evaluation;
• Jerushka needed further therapy to address her personality issue;
• both parents clearly love the child and nurture him in different ways;
• the grandparents need to remain in the child’s life;
• Leo had worked to provide tutors for L.J.;
• Leo was the more stable of the two parents, particularly with regard to the child’s school and development;
• the parents need to work to set aside their issues to promote the best interest of L.J.;
h* making Leo the domiciliary parent was in L.J.’s best interest;
• Jerushka would have visitation every other weekend, and daily telephone contact with L. J.;
• the parties would see a parenting coordinator for one year; and
• the parties should themselves work out a joint custody implementation plan, but if they could not, the court would.
The parties subsequently came up with a custody plan that the court adopted, and Jerushka Ellis now appeals.
ISSUES PRESENTED
• The trial court was manifestly erroneous in finding that1 Mr. Ellis should be designated as the domiciliary parent of the subject minor child.
• The trial court erred by failing to award Jerushka sufficient periods of physical custody.
MOTHER’S ARGUMENTS
On appeal, Jerushka argues that:
• the appointment of Dr. Wood was improper;
• Dr. Wood’s diagnosis of narcissistic personality disorder is .invalid;
• the trial court and the court’s expert failed to give proper consideration or weight to Leo’s previous history of abuse;
• the trial court and the court’s expert failed to give proper consideration or weight to Leo’s obsessive compulsive traits and over-controlling personality;
• Leo failed to establish sufficient grounds to change domiciliary parent status from Jerushka to himself;
• after the parties shared custody for three years, insufficient proof was presented to relegate Jerushka to every other weekend visits; and
• the weight of evidence established that Jerushka was a good mother with the stronger relationship' with the minor child and | ^therefore the trial court *758 should have weighed the Article 134 factors in her favor.
FATHER’S ARGUMENTS
Conversely, Leo argues that:
• the trial court engaged in substantial fact finding within its broad discretion in determining child custody and its finding that domiciliary placement with appellee was in the child’s best interest was not manifestly, erroneous.
• the trial court .did not abuse its discre- - tion -in appointing Dr. Julia Wood to evaluate the parties pursuant to La. R.S. 9:331;
• the trial court is vested with broad discretion in deciding child custody cases and in evaluating lay and expert witnesses, and the trial court did not abuse its discretion or manifestly err in evaluating L.J.’s best interests and considering the expert and lay testimony regarding the parties;
• the trial court did not abuse its discretion in changing the domiciliary parent from appellant to appellee; and
• the trial court did not abuse its discretion or' manifestly err in determining periods of custody to appellant.
ANALYSIS
The best interest of the children is the guiding principle in all custody litigation. La. C.C. art. 131; Howard v. Oden, 44,191 (La.App.2d Cir.2/25/09), 5 So.3d 989, writ denied, 2009-0965 (La.6/26/09), 11 So.3d 496. These difficult decisions are always fact-intensive. Wilbanks v. Wilbanks, 49,743 (La.App.2d Cir.2/4/15), 162 So.3d 432. Appellate courts must give great weight to a trial court’s determination of custody and visitation, and these decisions will not be overturned absent a clear abuse of discretion. Leeper v. Leeper, 44,777 (La.App.2d Cir.9/23/09), 21 So.3d 1006.
The trial court did not abuse its discretion in finding that the evidence supports placing domiciliary custody with Leo and fixing the visitation Imschedule at every other weekend. While both parents clearly love the child, the Article 134 [3] factors militate in favor of Leo' having domiciliary custody, particularly factors 2 and 8.
L.J. suffers from ADHD, His condition has manifested itself in his behavior at daycare, and it requires treatment and attention. The evidence showed that L.J. *759 has been moved from at least five different daycare facilities over his., short life, and the evidence further supports the trial court’s conclusion that Leo Ellis has demonstrated the •willingness and proven ability to manage LJ.’s issues vis-a-vis the child’s education. In particular, we believe the trial court to be right in finding that giving Leo domiciliary custody of L.J. will promote stability in the child’s life. Leo is now seven years old and just starting his primary school years. Stability in the child’s life at this time is essential to his development, and in' particular |nwhen there is a history of moving the child from one facility to another because of the actions of one parent, placement of the child with the other parent is appropriate.
Jerushka argues on appeal that the trial court should not have appointed Dr. Wood as an expert under La. R.S. 9:331,[4] that the doctor’s diagnosis is flawed, and that the court placed too much weight on that diagnosis rather than on the evidence of Leo’s failings. The appointment of a mental health professional is appropriate when there is a showing of “good cause.” In this case, the parties had at least one incident of domestic violence, so. the best interest of the child was clearly furthered by having an expert talk to the parties to get to the bottom of the conflict. Here, the expert’s evaluation was of great benefit to the court; the expert concluded that Leo did not have an anger management problem—he only had a problem dealing with Jerushka.
We further do not find that the trial court erred by relying on Dr. Wood’s report even in light of the appellant’s quibbles with the doctor’s diagnosis. That diagnosis. was only one of many factors that the court considered in making its determination, and in fact, the trial court focused on the appellant’s behavior more than the formal diagnosis,
112Like all of us, neither of these parties is perfect. The trial court heard the doctor’s evaluation of Leo explaining that he tended toward obsessive or controlling behaviors but the court considered all of the evidence in making its decision. The court was rightly concerned that this seven-year-old child had been in at five or six daycare facilities and the evidence showed that the mother’s behavior was behind many of these moves. Further, the doctor clarified that Leo’s problems might manifest themselves in relationships with a partner but were lqss likely to interfere with his relationship with L.J.
We further do not find reversible error in the trial court’s visitation schedule. The seven-year-old child is now in school, not daycare, and given his ADHD and' the' unfortunate history of his daycare experience, having the child spend midweek time with the mother would simply be too disruptive. Likewise, awarding the mother visitation every weekend would deprive Leo of time with the child on the weekends. The trial court’s choice to al-. ternate weekend visitation between the parents was reasonable given this child’s *760 condition and the factors that led the court to give domiciliary custody to the father.
CONCLUSION
At appellant’s cost, the judgment of the trial court is AFFIRMED.

. Both parties filed for divorce, and the trial court granted a divorce on May 7, 2013.

. Dr. Wood noted on this point, “I don't think she was trying to be mean or cruel to me, it was that I think that is how she interacts with everybody.”

. The court shall consider all relevant factors jn determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that'environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.

. La. R.S. 9:331 A. The court may order an evaluation of a party or the child in a custody or visitation proceeding for good cause shown. The evaluation shall .be made by a mental health professional selected by the parties or by the court. The court may render judgment for costs of the evaluation, or any part thereof, against any party, or parties, as it may consider equitable.
B, The court may order a party or the child to submit to and cooperate in the evaluation, testing, or • interview by the mental health professional. The mental health professional shall provide the court and the parties with a written report. The mental health professional shall serve as the witness of the court, subject to cross-examination by a party.